**THOMAS et al. v. WARNER–QUINLAN CO. OF TEXAS.**

**No. 1145.**

Court of Civil Appeals of Texas. Eastland.

Sept. 22, 1933.

Rehearing Denied Nov. 17, 1933.

Joe F. Orr, Rice M. Tilley, and H. A. Turner, all of Fort Worth, for plaintiffs in error.

Grisham & Grisham, of Eastland, Lyndsay D. Hawkins, of Breckenridge, and Wm. N. Bonner and V. Childress, both of Wichita Falls, for defendant in error.

FUNDERBURK, Justice.

J. Elmer Thomas and Hoffer Oil Corporation, who for convenience will be referred to as assignors, in pursuance of a contract dated July 1, 1929, on that day assigned to Warner-Quinlan Company of Texas, a corporation, who will be referred to as assignee, twelve described oil and gas leases upon lands situated in Eastland county, Tex. These leases will be referred to as eleven, since one had already expired at the time of the assignment. The recited consideration for the eleven leases was the obligation of the assignee to pay or to cause to be paid to the assignors "from its proportionate part and portion of oil, gas or casinghead gas (if any) that may be produced from said tracts, if, as, and when, produced, saved and sold or stored" the "equal 1/4th part and portion of such sums paid to it and realized by it or if stored, the posted price at the time run to storage, until in this way only" the assignors "jointly and without interest will have received the sum of One Hundred Forty Thousand ($140,000.00) Dollars to Hoffer Oil Corporation and Seventy Thousand ($70,000.00) Dollars to J. Elmer Thomas if this shall ever be." In addition to the above requirement as to payment of consideration, the material obligations imposed by the contract upon the assignee (other than the obligations imposed by the leases themselves) were stated as follows: "Second Party agrees that, at its own cost and expense, it will drill, or cause to be drilled (subject to the exceptions hereafter noted) three wells on some part of the acreage above mentioned, and will commence said wells in time to complete same within the terms of the existing leases (or any extensions that may be procured) thereon, in the ordinary course of business; but its full duty in this respect shall be discharged when, and if, it shall let the contract to competent drilling contractors who will commence the drilling of said wells and contract for their completion within a reasonable time; or Second Party's full duty in this respect will be fully discharged, as to the second and/or third well, when and if it shall re-assign to First Parties, at least ninety (90)

days before the expiration of the existing lease, or any renewal thereof, any and all leases which will expire within said time after failure to secure production thereon, it being agreed, in this connection, that Second Party will, without qualification, commence one well by the fifteenth of August, 1929 on a tract other than the two 80 acre one-half interest tracts (J. D. Gray and W. T. Hittson lands), and subject to the exceptions hereafter noted, will commence a second well by the fifteenth of September, 1929 on some tract above mentioned, and, within sixty (60) days after the completion of said well, will commence a third well on some tract above mentioned, and either of said last-mentioned wells may be joint wells with the Texas Company on the W. T. Hittson 80 acres above mentioned, but failing to so commence said second and/or third well, Second Party agrees that upon the written request of First Parties, it will re-assign to First Parties any or all of the twelve tracts above specifically described on which no wells have then been commenced, and which will expire for failure to secure production thereon, *and provided further that as to any of the twelve tracts above specifically described, if, within ninety (90) days before the termination of the present lease, or any renewal lease thereon, Second Party has not at some time drilled, and is not then drilling, a test well thereon, then, upon the written request of First Parties, Second Party will commence a well forthwith thereon or re-assign same to First Parties, provided, however, that when and if second party shall drill three wells all said leases vest in it unconditionally.*" (Italics ours.)

The last provision above quoted, namely, "provided, however, when and if second party shall drill three wells all said leases vest in it unconditionally," was inserted with pen and ink just before the contract was signed and after the remainder of the contract had been typewritten. On the same day the contract was made and leases assigned, a lease on two 80-acre tracts was also assigned for a recited consideration of "$1.00 (and other good and valuable considerations)," but which the evidence shows to have been $275,000 in cash. The contract made provisions and references to the lease on said two 80-acre tracts as follows:

(a) "First Parties' undivided one-half interest in two certain 80 acre tracts out of the W. T. Hittson and J. D. Gray lands not herein described or involved, has likewise been purchased for a large consideration paid therefor by Second Party, there being a producing oil well on one of said eighty acre tracts (J. D. Gray land) at this time."

(b) "The consideration of the purchase of the leases herein described is the following: Except from the two eighty acre tracts above mentioned (W. T. Hittson and J. D. Gray

lands)," etc., being the statement of the said consideration providing for payment out of production from the leases.

(c) "First Parties will not be entitled to receive any sum for any reason from production from the two 80-acre tracts above mentioned in which Second Party acquires an undivided one-half interest (J. D. Gray and W. T. Hittson lands)."

(d) The absolute obligation to commence one well by the 15th of August, 1929, was to be on a tract "other than the two 80-acre one-half interest tracts (J. D. Gray and W. T. Hittson lands)."

(e) The obligation to drill the second and third well applied to all the leases including that upon the two 80-acre tracts as shown by the provision reading: "and any of said last mentioned wells may be joint wells with The Texas Company on the W. T. Hittson 80-acres above mentioned."

(f) A provision that except as existing contracts may otherwise provide, second party should have the right and option to take for itself, on account, all oil, gas, casinghead gas and other minerals produced, expressly applied to such as was "produced from any of the land embraced in this purchase (including the two 80-acre tracts now owned jointly with The Texas Company)."

One other provision of the contract reads: " * * * And upon receipt by First Parties of the contingent oil money payments provided for above, they will own no further interest of any character in any of the surveys above described * * * and they will, upon request, execute quit-claim to all of such."

All the leases, the consideration for the assignment of which was to be paid out of production, expired by their own terms in the absence of production on or prior to July 18, 1930, except two known as the Grove leases which so expired on November 20, 1931. Not less than ninety days before the expiration of the latter, the assignors demanded in writing that the assignee drill upon same or make a reassignment thereof. The assignee refused to reassign, and failed to drill.

One of the leases covering a 140⅓-acre tract in which the interest assigned was three-fourths, the Humble Oil & Refining Company owning the other one-fourth, by its terms expired without production on June 5, 1930. Warner-Quinlan Company took a purported new lease on same dated July 6, 1930, for which it paid a cash consideration of $5,737.50. A producing well was thereafter drilled on same, the value of the production from which amounted to approximately $50,000. Before the expiration of said original lease, the assignors sought an agreement from the assignee to the effect that their interest in the new lease would be the same as under the first lease. This was refused, but assignors were asked if they would be will-

ing to pay the consideration for the new lease in consideration of receiving one-fourth of the production, to which it was replied that they preferred to stand upon their rights under said original contract.

Warner-Quinlan Company drilled four wells in compliance with their contract obligation to drill three.

In this suit brought by said assignors against said assignee, the plaintiffs contended that they were entitled to recover a money award of $210,000 (the maximum amount agreed to be paid out of production and contingent upon production) because of the alleged breach of said contract, consisting of the failure either to drill or reassign the two Grove leases. It was the theory of plaintiffs that the burden of proof was upon defendants, they having breached their contract, to show that the $210,000 would not have been realized out of production had there been no breach of contract. Plaintiffs further contended that the new lease on the 140⅛-acre tract was in legal effect a renewal of the former lease, or, if not, was at least impressed with a trust in favor of plaintiffs by reason of which they were entitled to an award of $210,000 as presumptively, in the absence of contrary evidence by the defendants, the amount which would have been received from production. In the alternative the amount claimed was one-fourth of $50,000, the amount the lessees actually received from production, and still further in the alternative the claim was in any event for nominal damages.

The defendants contended that the drilling of three or more wells relieved it, under the terms of the contract, from any obligation to either drill or reassign any of the leases; that plaintiffs had no interest, under the new lease, on the 140⅛-acre tract, and the same was impressed with no trust in their favor.

Upon the trial, the court gave a peremptory instruction for the defendant from which the plaintiffs have brought the case here upon writ of error.

The first question presented for determination involves an inquiry into the meaning and legal effect of two clauses in the contract, which for convenience, we shall here and hereinafter designate as "First" and "Second," as follows:

First. "Provided further that as to any of the twelve (11) tracts above specifically described if within ninety (90) days before the termination of the present lease or any renewal lease thereon, Second Party has not at some time drilled, and is not then drilling, a test well thereon, then, upon the written request of First Parties, Second Party will commence a well forthwith thereon or re-assign same to First Parties."

Second. "Provided, however, that when and if Second Party shall drill three wells all said leases vest in it unconditionally."

The second clause followed immediately the first and constituted the concluding part of the same sentence. The question is, Does the second clause limit or in any way vary the first? All parties contend that the contract is unambiguous. Notwithstanding that fact, parol evidence was introduced to show the purpose and intent of the second clause. We understand, however, the law to be that if the intention of the parties can be ascertained from a written contract, it is neither necessary nor permissible to resort to parol evidence. Certainly, if a contract is unambiguous, no resort can be had to parol evidence of intention. In agreement with the views of both contending parties, it is our opinion that the intention of the parties is shown with reasonable certainty by the provisions of the contract alone. It becomes necessary, therefore, to disregard the parol evidence.

The first clause above quoted had a possible operation regardless of whether the first three wells called for by the contract had been drilled (to completion) or not. The first well was required to be commenced by August 15, 1929, and the second by September 15, 1929. Since, as shown by the evidence, it required nearly ninety days to complete a well, it evidently was not intended that the first well should be completed before the second was commenced. The contract did not specify any particular time when any well was to be completed. The contract was complied with by so beginning any well required to be drilled in time to complete it before the expiration of the leases. The time intervening between the time for commencing the second well and the time when some of the leases, according to their provisions, would, in the absence of production, expire ninety days thereafter, was about five months and twenty-one days. The third well was not required to be commenced until sixty days after the second well was completed. The possibility may therefore plainly be seen that not all of the first three wells would necessarily have been completed when said first clause came into operation with the effect of requiring the assignee to begin drilling upon each of a number of leases or else upon request to reassign same. Since the first clause had a possible operation before the second clause came into operation, it is necessarily true that the last clause did not conflict with the first. The first would operate just so long as three wells had not been drilled to completion, and there were leases which, in the absence of production, would by their own terms expire ninety days thereafter. But just as soon as three wells had been completed, the first clause ceased to operate and the second clause became operative to relieve the assignee from the obligation either to drill or reassign the leases. Undoubtedly such is

the natural purport of the language of the two clauses in the connection in which they appear. They are part of the same sentence. The relation of one to the other is shown by the words "provided however." The word "however" means "nevertheless"; "notwithstanding"; "yet"; "still." 30 C. J. 475. Therefore, the second of the two clauses in question naturally purports to be an alternative provision to the preceding clause. If the first clause had the effect of rendering title to the leases conditional, there could be no contention whatever that the second clause was not what it purports to be. But it is argued that the first clause did not render conditional the title to the leases; that title to the leases became absolute in the assignee immediately upon delivery of the assignments. This may be granted to be true if by that is meant the vestiture of *technical* title, or if "unconditional" referred to the removing of technical conditions subsequent or conditions precedent as known in the law of estates. But the clause in question does not necessarily refer either to technical title or technical conditions. "Title" is not mentioned. The first clause, we think, may well have been regarded by the contracting parties as imposing conditions upon the assignee's rights even to the extent of reserving to the assignors some continuing interest in the leases as such. The contract itself affords positive evidence that the parties did not consider that by delivery of the assignments the assignors parted with all interest in the leases. It was agreed, as a part of the contract, that after the contingent oil money payments had been made—that is, $140,000 to Hoffer Oil Corporation and $70,000 to J. Elmer Thomas—"that they will *own* no further *interest* of any character in any of the surveys above described * * * and they will upon request execute quit-claim to all such." (Italics ours.) This clearly shows, we think, that whether correct or not the parties regarded the obligation to pay the contingent consideration for the assignments as having the effect to show a retention in the assignors of some interest in the leases of a nature which could possibly cloud the title of the assignee. If we suppose that the second clause in question was intended to refer to the removal of technical conditions subsequent or conditions precedent, and that it had the effect of making the vestiture of title absolute in that sense, then it would conflict with the intention shown by the provision last above quoted. According to one provision, title would become absolute when three wells were drilled, and according to the other when the $210,000 had been paid out of production. To so construe the one and give effect to it would be to relieve the assignee from the obligation to pay $210,000 contingent consideration as soon as three wells were drilled. The unconditional vesting of the leases as provided for in the second clause did not, of course, refer to conditions subsequent or conditions precedent (if any) in the leases themselves. The parties did not have the power to change the provisions of the leases. The conditions, therefore, were those which the contract provided for or was supposed to provide for. The condition or conditions, whatever it or they were, would have existed after the drilling of three wells. Otherwise the provision in question was not even intended to have any effect, a presumption we cannot indulge. What, it may pertinently be asked, could possibly be thought to constitute a condition upon which the leases were assigned which would, in the absence of the second clause, have continued to exist after the completion of the first three wells? To us it seems clear that there is nothing except the provision in the preceding clause. That, as already said, is the one to which it purports to have reference. To hold that it did not have exclusive reference to it would bring the provision, as has been suggested in direct conflict with that showing that the parties did not consider that the assignors had parted with all their interest in the leases until the entire consideration had been paid. It is therefore our opinion that the assignee, according to the undisputed evidence, was under no duty to drill or reassign the Grove leases.

The next question presented involves an inquiry into the facts and circumstances regarding the lease covering the 140⅛-acre tract, dated June 6, 1930, after the apparent expiration of the former lease on June 5, 1930. We think the contract and the lease considered together are not susceptible to the construction that the assignee was under any implied obligation to drill any other wells than those expressly provided for in the contract. In our opinion, the transaction by which the eleven leases were assigned and that by which the lease on the two 80-acre tracts were at the same time assigned should properly be regarded as one transaction, just the same as if the recited consideration had been $275,000 in cash and the contingent consideration to be paid out of production, the same as was provided. This view is based upon a consideration of the provisions and references in the contract to the two 80-acre tracts as shown in the foregoing statement. However, we do not regard the question as material. According to the express provisions of the contract and of the leases, there is no basis for any implication that the assignee was under obligation to drill any more wells than the contract provided for. The obligation to drill more wells, which it is insisted should be implied, would be in contradiction and denial of the expressed provisions of the contract. The effect of our views as expressed in discussing the first question would require us to hold that, at the time the new lease was taken, the assignee had breached no

duty to the plaintiffs in error. It was under no duty to procure any renewal or extension of the first lease, although, according to the contract, had it done so, same would have enured to the benefit of the latter. It sought such extension and failed to get it. The lease was owned three-fourths by defendant in error and one-fourth by the Humble Oil & Refining Company. For an independent consideration of $5,737.50 the new lease was obtained as against several competitors. All of the rights, absolute or contingent, of the plaintiffs in error were comprehended in the terms of the leases assigned, and the contract under which the assignments were made. Defendant in error, having committed no wrong as against plaintiffs in error, no constructive trust could arise out of the act of taking the new lease. The parties occupied no fiduciary relation, at least none looking beyond the natural terms of the leases assigned under the contract. We therefore conclude that the plaintiffs owned no interest in the production from the 140⅛-acre tract under the new lease.

It is therefore our conclusion upon the whole that the trial court did not err in instructing a verdict for the defendant, and that the judgment should be affirmed, which is accordingly so ordered.