**SUNAC PETROLEUM CORPORATION et al., Petitioners,**

v.

**Frank PARKES, Respondent.**

No. A–11391.

Supreme Court of Texas.

May 31, 1967.

Rehearing Denied July 19, 1967.

Golden, Croley, Howell, Johnson & Mizell, · Fred Lohmeyer and Robert S. Mizell, Dallas, for petitioners.

Gibson, Ochsner, Harlan, Kinney & Morris, John Morrison, Jr., Amarillo, for respondent.

GREENHILL, Justice.

This case · principally involves the construction of the provisions of an oil and gas lease dealing with operations, or lack of them, at and after expiration of the primary term, and also the question of whether a new lease was a "renewal or extension" of a former lease so as to perpetuate an overriding royalty interest. The suit was instituted by Frank Parkes to establish that he owned an overriding royalty interest and for a money judgment for royalties alleged to be due. The parties submitted the case to the trial court, sitting without a jury, upon an agreed statement of the facts. Judgment was for the plaintiff Parkes. The Court of Civil Appeals sitting at Amarillo reformed the judgment in matters not material here and affirmed. 399 S.W.2d 840 (1966).

The first question is whether the oil and gas lease in question terminated under its own terms. That question turns upon the 60-day and 30-day clauses in the lease dealing with operations in progress at the end of the primary term, the cessation of production, the completion of a dry hole after the end of the primary term, and related questions. This Court has had some of these problems heretofore in at least three cases: Rogers v. Osborn, 152 Tex. 540, 261 S.W.2d 311 (1953); Stanolind Oil & Gas Co. v. Newman Brothers Drill. Co., 157 Tex. 489, 305 S.W.2d 169 (1957); and Skelly Oil Co. v. Harris, 163 Tex. 92, 352 S.W.2d 950 (1962). Our decision on the first question is based upon those opinions, and they will be referred to several times herein.

As considered material here, the stipulated facts are these: on April 17, 1948, one O'Hern, as lessor, executed an oil and gas lease to the plaintiff Parkes. It provided for a royalty of ⅛th and a primary term of 10 years. The lease, which was on 160 acres in Ochiltree County, Texas, provided that it could be pooled for gas only.

On May 15, 1957, some nine year later, Parkes sold and assigned his lessee's interest to L. H. Puckett for $5,600. Parkes also reserved an overriding royalty of ¹⁄₁₆th of ⅞ths of the production from the lease, or from any extension or renewal thereof. The assignment provided that the assignee would be under no obligation to keep the lease in force by payment of rentals, by drilling, or by development operations, and that assignee should have "the right to surrender any or all part of such leased acreage without the consent of assignor." Thereafter Pucket assigned the oil and gas lease; and it subsequently was assigned to the petitioners, Sunac Petroleum Co. et al., who were the defendants in the trial court.

The end of the primary term, April 17, 1958, was approaching. On April 14, 1958, the lessees pooled the land in question with other lands for gas purposes only. On the following day, drilling operations began on land within the 640-acre gas unit but not upon the 160 acres in question. When the primary term ended on April 17, 1958, there was no production from, or operations upon,

the particular 160-acre lease, but a well was being drilled upon the gas unit.

On June 11, 1958, the well on the 640-acre gas unit was completed as an *oil* well as distinguished from a *gas* well. . Oil was produced in paying quantities from that well, at least until the commencement of a second well.

On June 24, 1958, approximately 68 days after the expiration of the primary term and 13 days after the completion of the oil well on the gas unit, the defendants Sunac et al. began the drilling of a second well on the particular 160 acres in question. The well was completed as a producing oil well on July 29, 1958; and the well continued to produce thereafter.

Approximately a year after the completion of the above-mentioned well on the 160 acres, the successors in interest of the lessor "asserted that a question existed as to whether or not the said lease had been maintained in force and effect during the period from the expiration of the primary term until drilling operations were commenced" on the 160 acres. Thereafter, on August 17, 1959, the lessees (now Sunac et al.) for a cash consideration of $27,000, "procured a new oil, gas and mineral lease" from the successors of the original lessor. As will be discussed more in detail later, the new lease had different provisions from the original lease. The well on the 160 acres was still producing when the new lease was executed. The lessees Sunac et al. stopped paying the ⅟₁₆th of ⅞ths overriding royalty to the plaintiff, Parkes, about December 1, 1959; and this suit followed.

Parkes, of course was entitled to a ⅟₁₆th of ⅞ths overriding royalty under the original lease and as long as it remained alive. If it was continued in force beyond the primary term by drilling or other operations, he is entitled to prevail under the original lease. We shall first decide, therefore, whether the original lease terminated under its own provisions.

The original lease contained these provisions:

"2. Subject to the other provisions herein contained, this lease shall be for a term of ten years from this date (called "Primary term") and as long thereafter as oil, gas or other mineral is produced from said land hereunder.

". . .

"5. If prior to discovery of oil or gas on said land Lessee should drill a dry hole or holes thereon, or if after discovery of oil or gas the production thereof should cease from any cause, this lease shall not terminate if Lessee commences additional drilling or reworking operations within sixty (60) days thereafter . . . . If at the expiration of the primary term oil, gas or other mineral is not being produced on said land but Lessee is then engaged in drilling or re-working operations thereon, the lease shall remain in force so long as operations are prosecuted with no cessation of more than thirty (30) consecutive days, and if they result in the production of oil, gas or other minerals so long thereafter as oil, gas, or other mineral is produced from said land."

Paragraph 9 gave the lessee the right to pool "the gas leasehold estate" and "the lessor's gas royalty estate" with other leases to create gas units of not more than 640 acres. It is then stated:

"The commencement of a well, or the completion of a well to production, on any portion of an operating unit shall have the same effect under the terms of this lease as if a well were commenced, or completed, on the land embraced by this lease."

Paragraph 5 above set out contains two sentences which provide for the continuation of the lease beyond the primary term. The first sentence speaks of *additional* drilling or reworking operations. The second sentence speaks of drilling or reworking operations.

This Court in Rogers v. Osborn, 152 Tex. 540, 261 S.W.2d 311 (1953), held that for the first sentence in paragraph 5 of the lease, the 60-day provision, to be brought into operation, one of two events must occur: (1) there must be a dry hole before a discovery of oil and gas, or (2) there must be a cessation of production after the discovery of oil or gas. In that case, before the end of the primary term, there had been a completed well which produced some gas and a trace of oil; and the well was intermittently opened or bled to remove nonmarketable oil and waste from it. The Court concluded that the well was not a "dry hole." Moreover, since there had been no marketable production, there could not have been a "cessation of production." The holding was that the 60-day first sentence of paragraph 5 was not operative and did not prolong the life of the lease. A second well, begun and completed as a producer after the primary term, did not continue or revive the lease. Rogers v. Osborn also had a holding with regard to the 30-day second sentence of paragraph 5. It will be discussed later herein.

The above requirements for the operation of the 60-day first sentence were repeated in Stanolind Oil & Gas Co. v. Newman Brothers Drilling Co., 157 Tex. 489, 305 S.W.2d 169 (1957). In *Newman Brothers,* there was a dry hole; and because of the dry hole, the holding was that the lease was prolonged under the 60-day provision.

Under the test of Rogers v. Osborn, which was reiterated in *Newman Brothers,* the 60-day first sentence of paragraph 5 did not come into play to prolong the lease in this case. We agree with the Court of Civil Appeals that the completion of an oil well is not to be considered as the drilling of a dry hole. 399 S.W.2d at 843. The completion of a producing oil well on a unit authorized for gas only, but not located on a particular lessor's premises, would not, and did not, prolong the life of the oil and gas lease on the 160 acres.

The 30-day second sentence in paragraph 5 deals with drilling and reworking operations. As was pointed out in Rogers v. Osborn, the sentence does not speak of *additional* drilling (the drilling of additional wells), but it speaks of drilling and reworking operations being conducted at the time of the expiration of the primary term. An additional holding of this Court in Rogers v. Osborn was that the drilling or reworking must be upon the particular well being drilled or reworked at the expiration of the primary term in order for the 30-day second sentence to become operative. The opinion states that the 30-day second sentence of paragraph 5 applies to "continuous prosecution of the very operations" being conducted when the primary term ended.

In *Newman Brothers,* there was a well being drilled at the end of the primary term, and the Court held that the 30-day second sentence prolonged the life of the lease [at least] until the completion of the well as a dry hole. Since the well was completed as a dry hole at a time when the lease was in force and effect, the Court further held that the drilling of the dry hole, prior to the discovery of oil or gas, brought into effect the 60-day first sentence of paragraph 5. A second well was completed within 45 days from the plugging of the dry hole. So the lease was held not to have terminated under the specific drilling operations of the 30-day provision which resulted in a dry hole, and the dry hole in turn brought into play the 60-day sentence of paragraph 5.[1]

In the case at bar, the particular operation under way at the expiration of the primary term did not end in a producer of gas so as to perpetuate the lease under the

1. The dissent in Newman Brothers was of the view that the dry hole must have occurred before the end of the primary term for the 60-day provision to have applied. Under that view even if the oil well on the gas unit here were considered to be a "dry hole," it was not completed during the primary term; and hence the lease here under consideration terminated.

30-day second sentence of paragraph 5. There were no additional drilling or reworking operations on the particular well, the oil well on the 640-acre gas unit. Under Rogers v. Osborn and *Newman Brothers,* the drilling of another well after the primary term would not prolong the lease unless the particular operation being conducted at the expiration of the primary term resulted in a dry hole (or, under other circumstances, upon cessation of production). So the lease was not prolonged after the end of the work or final operations on the first well under the 30-day clause, and the well did not end in a dry hole or cessation of production so as to activate the 60-day clause.

The parties also cite Skelly Oil Co. v. Harris, 163 Tex. 92, 352 S.W.2d 950 (1962). In *Skelly,* both provisions similar to those in paragraph 5 of the lease here involved had 60-day time limitations; i. e., the second sentence dealing with drilling and reworking also gave the lessee a 60-day period rather than 30 days. In *Skelly,* a well was being drilled at the end of the primary term on the unit with which the land in question had been pooled. The well was completed as a producing gas well, but it was capped because there was no pipeline immediately available. Within 60 days the lessee procured a pipeline connection, and production promptly commenced. The holding was that the lease did not terminate. The 60-day clause (similar to the 30-day clause in the lease in question) gave the lessee 60 days after cessation of operations within which to begin production from that well. If it had been completed as a dry hole, the opinion in *Skelly* said the lessee would have had 60 days under the provisions of paragraph 6 [paragraph 5 of the lease before us] in which to commence additional drilling or reworking operations.

■ Our holding here is that the first oil and gas lease terminated. The drilling and completion of the particular operation (the oil well) off the lessee's premises after the primary term did not end in the production

of gas so as to prolong the lease under the 30-day provision; and there was no cessation of production or dry hole to activate the 60-day sentence.

## RENEWAL OR EXTENSION OF LEASE

We now turn to the question of whether the second lease from the successors of the lessor O'Hern was a renewal or extension of the original lease. The Court of Civil Appeals held that it was, relying upon its determination that the original 1948 lease was still in force when the second lease was obtained in 1959. In the light of our conclusion that the original lease had expired under its own terms, and for the reasons discussed below, we cannot agree with that conclusion.

Most of the cases holding that a subsequent lease was an extension or renewal of an earlier lease have intermixed the related questions of estoppel and constructive trust. We shall treat these questions separately.

■ It seems clear that the new lease was not an *extension* of the old lease. An extension, as used in this context, generally means the prolongation or continuation of the term of the existing lease. Mutual Paper Co. v. Hoague-Sprague Corp., 297 Mass. 294, 8 N.E.2d 802 (1937). It might also encompass the enlarging of the territory or strata to be covered by the lease. The parties here did none of these things. As enlarged upon below, the lease had long since expired, and there was a new lease on the same land upon substantially different terms.

■ Moreover, we do not regard the new lease (and the parties refer to the second lease as a *new* lease in their stipulated facts) as a *renewal* of the old lease. The lessors and lessees entered into the new lease over a year after the old lease had expired. Ordinarily when an oil and gas lease has expired, the lessor is free to deal with the property as he sees fit. He may develop

and operate it himself, or he may lease it to whomsoever he pleases and on such terms as may be agreed upon.

At the time the old lease was executed, the land had not been proved to be productive. While the lessee had the right to drill, he could defer drilling during the 10-year primary term by the payment of delay rentals. When the new lease was executed, there was a producing oil well on the east half of the 160 acres. The new lease provided that, except as to the royalty and other right reserved to lessors, the lessors conveyed all their interest in the oil well to the lessees. It is stipulated that the lessees paid lessors $27,000 for the new lease.

The new lease had other terms substantially different from the old. The original lease had a 10-year primary term and provided for delay rentals. The new lease, on the other hand, had no primary term and no provision for delay rentals. The new lease provided that it would terminate as to the west half of the 160 acres unless the lessees began the drilling of a well within one year and continued operations, with no cessation of more than 60 days, until the production of oil or gas was obtained. If no such well were drilled or no production obtained as set out in the new lease, the lessees agreed to execute a release of the west half of the 160 acres. The 30- and 60-day provisions of the new lease were different from those in paragraph five of the old lease.

■ Since the new lease was executed under different circumstances, for a new consideration, upon different terms, and over a year after the expiration of the old lease, we hold that the new lease was not a renewal of the old lease. See Meeker v. Ambassador Oil Co., 308 F.2d 875 (10th Cir. 1962), rev'd on other grounds, 375 U.S. 160, 84 S.Ct. 273, 11 L.Ed.2d 261 (1963); K. & E. Drilling, Inc. v. Warren, 185 Kan. 29, 340 P.2d 919 (1959).

## CONFIDENTIAL RELATIONS AND CONSTRUCTIVE TRUST

There are cases from other jurisdictions which hold that a second lease is, or will be treated as, an extension or renewal of an original lease because the lessee is regarded as a trustee and is adjudged to hold the overriding royalty in the subsequent lease subject to a constructive trust in favor of the owner of the overriding royalty. As a basis for their holdings, these cases have relied on either (1) specific language in the assignment or (2) the close relationship between the parties shown by the particular facts involved.

In Probst v. Hughes, 143 Okl. 11, 286 P. 875, 69 A.L.R. 929 (1930), the lessee, before the expiration of the original lease, took a new lease which cut off the holder of the overriding royalty. The court wrote at length on relationships of trust and confidence and concluded that the new lease was a renewal or extension of the original lease. Similarly, in Howell v. Cooperative Refinery Association, 176 Kan. 572, 271 P.2d 271 (1954), a constructive trust was imposed in favor of a joint adventurer who had held an overriding royalty under the original lease. In a case tried upon a demurrer, the facts were assumed to be that the plaintiff furnished geological information to defendant for which he received his overriding royalty in the original leases. Thereafter the plaintiff furnished additional information leading to the procurement of the new lease. It was agreed between plaintiff and defendant that the new lease would be taken by a third party, and plaintiff expected that defendant would convey to plaintiff his overriding royalty interest. The new lease, as agreed, was taken by the third party after the expiration of the old lease, and it was assigned to defendant; but the defendant refused to honor plaintiff's overriding royalty. The holding was that plaintiff alleged a joint interest and ownership of the mineral estate; that plaintiff and defendant were in a position of trust and confidence; and hence the new lease would be treated as

a renewal or extension of the old lease. To the same effect are Oldland v. Gray, 179 F.2d 408 (10th Cir. 1950); and Rees v. Briscoe, 315 P.2d 758 (Okl.1951).

Another situation in which some courts have protected the holder of the overriding royalty is called a "washout" transaction, generally involving some bad faith on the part of the lessee. In this type of situation, the operator takes a new lease before the expiration of the old lease and then simply permits the old lease to expire. Oldland v. Gray, 179 F.2d 408 (10th Cir. 1950); 2 Williams and Meyers, Oil and Gas Law § 420.2 (1964).

Parkes assigned the lease to Puckett, and Sunac received its interest only after numerous intermediate assignments. There is no evidence that Sunac occupied a position of confidence or trust with Parkes other than the clause relating to extensions or renewals. Sunac made a substantial effort to develop the land in question by pooling it for gas as authorized and by drilling a well. It failed, however, to keep the original lease in force because the well produced oil instead of gas. Sunac took a new lease to protect its interest only after the owners of the property raised a question as to the validity of the original 1948 lease.

The language most often pointed to by the courts as creating a fiduciary relation in this type of situation provides that the overriding royalty will apply to any extensions or renewals of the lease assigned. The assignment from Parkes to Sunac uses such phraseology. In addition, however, the assignment contains this significant provision:

"There shall be no obligation, express or implied, on the part of Assignee, its successors or assigns, to keep said lease in force by payment of rentals or drilling or development operations, and Assignee shall have the right to surrender all or any part of such leased acreage without the consent of Assignor."

Sunac was under no duty to develop the land or continue the lease in force; to the contrary, the assignment expressly gave it the right to surrender the lease at any time without Parkes' consent. Fain & McGaha v. Biesel, 331 S.W.2d 346 (Tex.Civ.App. 1960, writ ref'd n. r. e.); Montgomery v. Phillips Petroleum Co., 49 S.W.2d 967 (Tex. Civ.App.1932, writ ref'd); Thomas v. Warner-Quinlan, 65 S.W.2d 321 (Tex.Civ.App. 1933, writ ref'd). We construe the "renewal or extension" provisions together with the provision set out as relieving the lessee from the duty to perpetuate the lease, and thus the overriding royalty. This latter provision materially distinguishes the cases relied upon by Parkes.

■ Normally, when an oil and gas lease terminates, the overriding royalty created in an assignment of the lease is likewise extinguished. It is also generally held that the assignment of an oil and gas lease reserving an overriding royalty in the assignor does not usually create any confidential or fiduciary relationship between the assignor and his assignee. Wagner v. Sheets & Walton Drilling Co., infra; Thomas v. Warner-Quinlan Co., 65 S.W. 2d 321 (Tex.Civ.App.1933, writ ref'd); Brannan v. Sohio Petroleum Co., 260 F.2d 621 (10th Cir. 1958); Keese v. Continental Pipeline Co., 235 F.2d 386 (5th Cir. 1956); 2 Williams and Meyers, Oil and Gas Law § 518.2 (1964); 3 Summers, Oil and Gas § 554 (2d ed.1958); Warren, Transfer of the Oil and Gas Lessee's Interest, 34 Texas L.Rev. 386, 415–16 (1956).

■ This Court has previously held that a constructive trust arises where there is a fiduciary or confidential relationship between two or more parties and the party holding certain property would profit by a wrong or be unjustly enriched if he were allowed to keep the property. Omohundro

v. Matthews, 161 Tex. 367, 341 S.W.2d 401 (1960). Under the facts of this case, we see no basis for a holding that there existed a confidential or fiduciary relationship. There is no constructive trust.

Thomas v. Warner-Quinlan, 65 S.W.2d 321 (Tex.Civ.App.1933, writ ref'd), is cited and discussed by both sides. There Thomas had an oil and gas lease on twelve tracts of land. He assigned the leases to Warner-Quinlan Co., reserving an oil payment of $210,000 to be paid out of ¼ the receipts from the oil and gas recovered. The assignment provided that Warner-Quinlan was to drill three wells within the term time of the leases or any extensions or renewals, or reassign the leases to Thomas; but that once three wells had been commenced, the leases would "vest unconditionally" in Warner-Quinlan. Warner-Quinlan commenced three wells within the time. Several of the leases, however, expired because of failure to drill on them specifically; and Warner-Quinlar took a new lease on one of these tracts thirty-one days after the old lease on it had expired. Thomas sued, seeking to impress a trust on the new lease taken by Warner-Quinlan in the amount of his reserved oil payment. The court in refusing Thomas any relief held (1) Warner-Quinlan was under no duty to drill any additional wells after it completed the three required under the assignment; (2) the parties did not occupy a fiduciary relation, and Warner-Quinlan owed no duty to procure a renewal or extension of the lease even though, according to the court, such a renewal or extension would have inured to Thomas's benefit under the terms of the contract of assignment.

In *Thomas* the assignee owed no duty to further develop the leases after he completed three wells; in the case at hand Sunac owed no duty to Parkes to develop the lease under the provisions of the assignment. The provisions of the assignment

relieved Sunac of any duty to drill and allowed it to surrender the lease at its option.

Moreover, the fact that Sunac might have recognized that Parkes' overriding royalty interest was outstanding as late as November, 1959, did not create a confidential relationship between Sunac and Parkes. The provisions of the two leases and the assignment are controlling here. Wagner v. Sheets & Walton Drilling Co., 359 S.W.2d 543 (Tex.Civ.App.1962, writ ref'd n. r. e.). They show, as we have discussed, that the 1948 lease expired and with it Parkes' overriding royalty. There is no provision for Parkes' interest in the new lease, and we decline to impose a constructive trust on it for his benefit. Wagner v. Sheets & Walton Drilling Co., supra.

## ESTOPPEL

The Court of Civil Appeals concluded that by their conduct the parties treated the 1948 lease as remaining in effect until it was superseded by the new lease in 1959. On this basis the court held that Sunac was estopped to deny Parkes' claim.

It is true that Sunac continued to pay Parkes his overriding royalty through November of 1959. We do not believe, however, that this constituted a material misrepresentation on Sunac's part, or that Parkes, in reliance on these payments, acted to his prejudice or changed his position. Sunac, therefore, is not estopped to deny that Parkes' overriding royalty is applicable to the new lease. Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929 (1952); Jones v. Mid-State Homes, Inc., 163 Tex. 229, 356 S.W.2d 923 (1962).

The judgments of the courts below are reversed, and judgment is here rendered for petitioners.

Smith, Hamilton and Pope, JJ., dissenting.

## DISSENTING OPINION

HAMILTON, Justice.

I respectfully dissent.

I think the question as to whether or not the August 17, 1959, lease was a renewal[1] of the 1948 lease should be determined as of the time and under the circumstances existing at the time the lessors and the petitioners, Sunac Petroleum Corporation et al., entered into the new lease.

It is uncontradicted that all parties, the lessors and petitioners, as well as the respondent, treated said 1948 lease as being in force and effect at all times up until it was effectively canceled by virtue of the new lease executed by the lessors and petitioners. Although lessors had raised a question as to the validity of the lease, the lessors and petitioners chose not to have that question determined, but instead entered into a new lease to take the place of the questionable lease. At that time the question of law as to whether the old lease had expired under its own terms was one that had not been decided by this Court or any other court in this jurisdiction or any other jurisdiction. Furthermore, even if it be determined that the old lease expired under its own terms, there may have been a question of fact as to whether the lessors would be estopped to claim that the old lease had expired by having permitted the expenditure by petitioners of vast sums of money in drilling a well on the land in question and in operating said lease for more than a year without any complaint from lessors.

Instead of having these questions determined by a court of law, the lessors and petitioners settled their differences by entering into this new lease. Petitioners, without ever giving up possession of the premises, continued its operation just as it had been doing. When you add to this fact situation the fact that petitioners admitted that the new lease was a renewal of the old lease, by paying to respondent the override provided for in his assignment, for several months under the new lease, there is ample evidence to sustain the trial court's finding that the new lease was in fact a renewal of the old lease. For this reason I would affirm the judgments of the trial court and the Court of Civil Appeals.

However, if the proper disposition of this case requires that the question of the effect of the completion of an oil well on a consolidated gas unit after the expiration of the primary term of the lease involved be resolved, and consequently the question of whether or not the 1948 lease in fact remained in force until the effective date of the new lease be resolved, then it is respectfully submitted that, under the facts of this case, the said 1948 lease did in fact remain in force.

The 1948 lease authorized the lessee to combine the 160 acres with other lands as to the gas leasehold estate. Two days before the primary term of the original lease expired, Sunac placed the 160-acre lease in a unit with other lands and commenced drilling operations. These operations were on the land within the unit but were off the land included within the original 160-acre lease. As a consequence of the lease and the gas unit, Sunac needed to complete a well that produced gas in order to hold the lease by production. If it did so, it complied with the terms of the original lease. Instead of a gas producer, however, the well was completed as a producing oil well on June 11, 1958.

Completion of the producing oil well did not continue the lease in force, but Sunac on June 24 commenced the drilling of another well that was located on the original

---

1. The assignment provided, "Assignor hereby reserves unto himself, his successors, heirs and assigns as a perpetual overriding royalty * * * 1/16 of 7/8 of all the oil, gas and/or casinghead gas, if, only, as and when produced, saved and sold from the premises covered by this lease, *or any extensions or renewals thereof* * * *." (Emphasis added.)

160-acre tract. It did this by authorization of this provision of the original oil and gas lease:

"If, prior to discovery of oil or gas on said land, lessee should drill a dry hole or holes thereon, or if after discovery of oil or gas the production thereof should cease from any cause, this lease shall not terminate if lessee commences additional drilling or reworking operations within sixty days thereafter or (if it be within the primary term) commences or resumes the payment or tender of rentals on or before the rental paying date next ensuing after the expiration of three months from date of completion of dry hole or cessation of production. * * *"

The second drilling operation resulted in a producing oil well on July 29, 1958.

The quoted provision was construed in Stanolind Oil and Gas Company v. Newman Brothers Drilling Company, 157 Tex. 489, 305 S.W.2d 169 (1957). We held in that case that a lessee, who prior to discovery of oil or gas, and within the primary term, commences drilling which results in a dry hole, may, within sixty days commence additional drilling. In the Newman case the additional drilling operations resulted in production, and we held that the lease did not expire. The Court of Civil Appeals in this case held that the production of oil on the lands which required the production of gas only was the completion of a producing well rather than a "dry hole" and there was no authorization for drilling the second well to keep the lease alive. With this I disagree.

The majority has held that the production of oil was not production which would hold the gas-only unit and hence it would not hold the original lease. The majority, however, holds that the completion of the oil well prevented the well from being a "dry hole". Hence we have the majority holding that under the terms of the lease, the same well may be classified as a producer for some purposes but as a nonproducer for others. It is a non producer, says the majority, and will not hold the lease. But it is not a dry hole because it is a producer. It is inconsistent to say that the production of oil does not keep the lease alive but to say that the production of oil keeps the completed well from being a dry hole. Consistency as well as the meaning of the lease compels the construction that the production of oil on a gas-only unit was not production and because it was not production it was a dry hole.

The pooling provision of the original lease equates non production with a dry hole. The provision concludes with this sentence:

"The commencement of a well, or the completion of a well to *production,* on any portion of an operating unit shall have the same effect under the terms of this lease as if a well were commenced, or completed on the land embraced by this lease." (Emphasis added.)

If, as the majority holds, the completion of the oil well was not production under the lease and particularly the pooling provision it had to be a dry hole. Because it was a dry hole, the Newman case applies, and additional drilling was timely commenced which resulted in production of an oil well. The lease did not lapse.

Even though the Court has held that the 1948 lease had expired of its own terms prior to the execution of the new lease, nevertheless the new lease was a renewal of the 1948 lease in view of the position of trust and confidence and fiduciary relationship established between the parties by virtue of the language in the assignment. All that is necessary in order to clearly establish that a fiduciary relationship existed between petitioners and respondent is to note, in the light of the many authorities on such point, that respondent's overriding royalty interest expressly was reserved under the lease of April 17, 1948, or any extensions or renewals thereof, and the relative positions of petitioners, as the work-

ing interest owners, and respondent, as an overriding royalty interest owner.

There are many authorities directly holding that the creation of an overriding royalty interest or production payment by exception and reservation in an assignment of a designated lease, or any extensions or renewals of such lease, creates, in and of itself, a fiduciary relationship between the assignor (overriding royalty interest owner or production payment interest owner) and the assignee (working interest owner) and their respective successors in interest, irrespective of whether any confidential or personal relationship in fact exists between such parties. Howell v. Cooperative Refinery Association, 176 Kan. 572, 271 P.2d 271, (1954); Thornburgh v. Cole, 201 Okl. 609, 207 P.2d 1096, (1949); Probst v. Hughes, 143 Okl. 11, 286 P. 875, (1930); 24 Am.Jur. 590, Gas and Oil, Sec. 82; Summers Oil & Gas, Permanent Edition, Sec. 554, pp. 635–639. Such principle is set forth in the Probst case, in Am.Jur., and in Summers Oil & Gas, respectively, in the following language:

Probst case, 286 P. 875, at page 878:

"It is thus to be seen that a trusteeship may arise by virtue of any relationship of the parties in which it may be said that the one occupying the position of trustee is in duty bound to act in the utmost good faith for the benefit of the other. We think that relation here existed. *Under the terms of plaintiff's assignment,* defendants were under the obligation to exercise the utmost good faith to secure a renewal or an extension of the lease if they desired to continue to further prospect the property for oil or gas, as was the case under the facts disclosed by this record." (Emphasis added.)

Since the opinion in the Probst case discloses that no confidential or personal relationship existed between the parties and that there were no unusual terms or provisions in the instrument of assignment, but that said instrument of assignment provided to the effect that the overriding royalty interest there created was applicable to any leases in extension or renewal of the assigned lease, the fiduciary relationship which the court found to exist could have arisen only from the relative positions of the parties and the "extension or renewal" provisions of the instrument of assignment.

24 Am.Jur. 590, Gas & Oil, Sec. 82:

"Relationship Arising from Transfers. —While the transfer of a lease does not ordinarily create any confidential relationship between the parties, this is not, of course, always the case. The terms of the conveyance may be such as to impose upon the assignee or sublessee the duty of protecting the interests of the assignor or sublessor; and, whenever they are of such character, he must comply with the general rules that govern the conduct of persons occupying a trust status, and any effort on his part to procure from the lessor rights antagonistic to those of the assignor will be defeated. *Thus, when an assignment expressly provides that any extension or renewal of the lease shall be subject to the overriding royalty therein agreed upon, the courts will regard a new lease procured by the assignee as an extension or renewal of the old one and charge it with the royalty so reserved, even though it was not granted until production under the former lease had come to an end. * * *"* (Emphasis added.)

Summers Oil & Gas, Permanent Edition, Sec. 554, pp. 634–639:

"While the right to overriding royalty, or a sum of money paid out of production on oil or gas, created in the assignment, does not survive the termination of the assigned lease, yet in a number of cases the assignor has claimed that the assignee, by permitting the lease to expire, or by surrender thereof, and the taking of a second lease from the lessor, has violated a relation of trust and con-

fidence, and that the assignor should be entitled to such overriding royalty or money out of production under the renewal lease. The mere assignment of an oil and gas lease created no such fiduciary relation. If it is created, it must be by the terms of the assignment. In a number of cases the courts have held that the provisions of the assignment did not create a fiduciary relation between the parties so that the assignor would be entitled to the payment of overriding royalties or to the sums out of oil or gas produced under a second lease taken by the assignee. *But where the assignment of a lease expressly provided that the reservation of an overriding royalty should apply to extensions, renewals or modifications of the lease that the assignee or his successors might secure, it was held that such provision created a relation of trust and confidence between the assignor and his assignees permitting the assignor to payment of the overriding royalty reserved in the assignment out of oil or gas produced under the second lease.*" (Emphasis added.)

Moreover, there are a number of authorities holding that the respective positions of an assignor-overriding royalty interest owner and an assignee-working interest owner creates a fiduciary relationship between said parties, and their respective successors in interest, merely from the relative positions of said parties, irrespective of whether or not there is any confidential or personal relationship between said parties and irrespective of whether the assignment creating the overriding royalty interest expressly provided to the effect that such interest will be applicable to renewal or extension leases. Rees v. Briscoe, 315 P.2d 758 (1957); Oldland v. Gray, 179 F.2d 408 (Cir.Ct.App. 10th, 1950, cert. den., 339 U.S. 948, 70 S.Ct. 803, 94 L.Ed. 1362); Kennedy v. Seaboard Oil Company of Delaware, 99 F.Supp. 730 (U.S.D.Ct., Cal., 1951).

An excellent example of the imposition by the law of such fiduciary relationship

between parties to oil and gas transactions, merely by reason of the relative positions of such parties and irrespective of the existence of any confidential or personal relationship between such parties, is the long judicially recognized duty imposed upon the owner of the leasing power to exercise such power in such manner as to constitute the utmost good faith toward a nonparticipating royalty owner whose interest is subject to such leasing power.

Schlitter v. Smith, 128 Tex. 628, 101 S.W. 2d 543, (1937), involved a deed to land wherein the grantor reserved "an undivided one-half interest in and to the royalty rights on all of oil and gas and other minerals in, on and under or that may be produced from the land herein conveyed." The court held that the grantor was entitled to receive one-half of such royalty as may be reserved in any oil, gas or mineral lease which may be executed by the grantee. It said: "We think that self-interest on the part of the grantee may be trusted to protect the grantor as to the amount of royalty reserved. Of course, there should be the utmost fair dealing on the part of the grantee in this regard."

Further, as reflected by the above authorities, the law applicable to oil and gas transactions goes beyond the traditional fiduciary concept and imposes a fiduciary relationship between the parties to an assignment of an oil and gas lease, in which assignment the assignor excepts and reserves an overriding royalty interest in the production under the assigned lease or any extensions or renewals thereof, merely by reason of the "extension or renewal" provisions of such assignment, irrespective of, and in the complete absence of, any confidential or personal relationship between such parties.

There are no cases to be found in this jurisdiction or in any other jurisdiction, holding a lease taken by the assignee, or by the assignee's successors in interest, after the expiration of the assigned lease and

covering the same land as the assigned lease, not to be in extension or renewal of the assigned lease, and therefore not burdened with the excepted and reserved interest, where the instrument of assignment creating the excepted and reserved interest expressly provided to the effect that the excepted and reserved interest was to be applicable to leases in extension or renewal of the assigned lease. Despite the Court's reliance upon them, neither the case of Thomas v. Warner-Quinland Company of Texas, 65 S.W.2d 321 (Tex.Civ.App. 1933, error ref.) nor the case of Wagner v. Sheets & Walton Drilling Company, 359 S.W.2d 543, (Tex.Civ.App.1962, error ref., n. r. e.) are such cases.

In the Thomas case certain leases were assigned, the assignor excepting and reserving a production payment interest in production from the assigned premises, but which exception and reservation made no reference whatsoever to the excepted and reserved interest being applicable to leases in extension or renewal of the assigned leases; the assignment provided that the assignee was to commence three wells on the premises covered by the assigned leases in such time as to complete same within the terms of the assigned leases, or any extensions that might be procured, one of which wells was to be commenced by a specifically designated date, such drilling obligations, however, to be fully discharged when and if assignee re-assigned to assignor, at least ninety (90) days before the expiration of the assigned leases, or any renewals thereof; the assignment further provided that, when and if assignee had drilled said three wells, all of the assigned leases would vest in assignee unconditionally, which provision was entitled to, and was given by the court, particular significance by reason of the fact that such provisions had been inserted by pen into the otherwise typewritten assignment. Therefore, it easily is perceived that, under the express terms of the assignment in the Thomas case, the only words contained in the assignment pertaining to extension or renewal of the assigned leases were confined to, and were applicable only to, the portion of the assignment delineating the time within which the assignee was required to drill the three wells, or to re-assign to assignor the assigned leases, and that, under the express terms of the assignment, such words pertaining to extension or renewal of the assigned leases were not made applicable to the excepted and reserved interest. Moreover, in the Thomas case the assignee had drilled the three wells, in compliance with assignee's drilling obligations under the assignment, prior to the time that assignee procured the new lease referred to in said case, and said case turned on such fact; the court determined that, in view of the provision inserted into the assignment by pen, referred to above, the assignor had no further interest in the assigned leases after the assignee had complied with the referenced drilling obligations, except insofar as concerned the excepted and reserved interest under only the assigned lease, which holding was in conformity with the provisions of the particular instrument of assignment involved.

As concerns the Wagner case, there is no indication whatsoever in the opinion that the assignment there involved contained any provisions to the effect that the excepted and reserved interest was to be applicable to leases in extension or renewal of the assigned lease, and therefore the facts of that case are distinguishable on a material point from the facts of the instant case, and said case does not in any wise support petitioners' position in the instant case.

The comment on the Wagner case immediately above set forth is equally applicable to the case of Brannan v. Sohio Petroleum Company, 260 F.2d 621 (Cir.Ct. App. 10th, 1958) since the assignment there involved did not contain any provisions to the effect that the excepted and reserved interest was to be applicable to leases in extension or renewal of the assigned lease.

The Court says that the cases relied upon by respondent are distinguishable from the

instant case in that the assignee was not interest was to be applicable to leases in force and was given the right to surrender the lease without the consent of respondent by this provision:

"There shall be no obligation, express or implied, on the part of Assignee, its successors or assigns, to keep said lease in force by payment of rentals or drilling or development operations and Assignee shall have the right to surrender all or any part of such leased acreage without the consent of Assignor."

In its holding the Court says: "We construe the 'renewal or extension' provisions together with the provision set out as relieving the lessee from the duty to perpetuate the lease, and thus the overriding royalty." The Court seems to be saying that since this provision in the assignment relieves the assignee of any duty to perpetuate the lease that the "renewal or extension" provision means nothing. Upon examining the lease here it is found that this provision does not relieve the lessee (assignee) of any duty therein imposed. The lease did not require any development to be made, it did not require any rentals to be paid. It merely provided that if one or the other did not take place the lease would terminate. Furthermore, the lease provided:

"Lessee may, at any time prior to or after the discovery and production of minerals on the land or on acreage pooled therewith, execute and deliver to Lessor or place of record a release or releases of any portion or portions of the lands and be relieved of all requirements hereof as to the land surrendered, and, if during the primary terms, the rental shall be reduced proportionately, according to acreage."

I agree with the Court that Sunac was under no duty to develop the land or to continue the lease in force. The lease imposed no such duty. The above quoted provision in the assignment merely reiterates that fact. I also agree that Sunac had the right to surrender the lease or any part thereof, even though the lease is held by production. The above quoted clause merely reiterates that right. The provision relieves Sunac of no duty imposed by the lease, and gives them no rights not granted by the lease. Consequently, it is difficult to understand by what reasoning the Court can say that such provision destroys the relationship of trust and confidence created by the "renewal or extension" provision contained in the assignment. The Court does not cite any cases in support of such conclusion, nor have I been able to find any such cases.

By reason of the peculiar circumstances existing at the time the new lease was taken, it is submitted that they in themselves create a relationship of trust and confidence between the parties. When the question of invalidity of the lease was raised by the lessors to Sunac, Parkes' rights were involved just as were Sunac's. If Sunac had stood its ground and suffered a lawsuit, Parkes would have been an indispensable party defendant. Parkes had just as much right to settle with the lessors as did Sunac, but Parkes had no opportunity to settle. Sunac went behind his back and sold him out by taking a new lease and thereby releasing the old one. This sort of conduct should not be allowed to cut Parkes out.

It is respectfully submitted that for the reasons and under the authorities indicated above there existed between petitioners and respondent a fiduciary relationship not only by reason of the "extension and renewal" provision, but by reason of the peculiar circumstances existing at the time the new lease was taken. Such new lease constituted a renewal of the old one irrespective of whether or not the latter lease in fact terminated prior to the effective date of the former lease.

I would affirm the judgments of the Court of Civil Appeals and the trial court.

SMITH and POPE, JJ., join in this dissent.