**Opinion issued March 5, 2013**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-11-00593-CV

_____

**STROUD PRODUCTION, L.L.C., PLANTATION PETROLEUM
CORPORATION, AND ROBERT A. STROUD, Appellants**

**V.**

**PATRICK E. HOSFORD, MORRIS L. ETHEREDGE, DAVID T.
THREINEN, AND NELSON E. WOODS, Appellees**

---

**On Appeal from the 405th District Court
Galveston County, Texas
Trial Court Case No. 07CV1461**

---

## DISSENTING OPINION

I respectfully dissent. This a case of first impression regarding the lessee's

intentional wash-out of overriding royalty owners' interests in two oil and gas

leases in Galveston County, Texas (the "Bowers and Gordon Leases" or "the B&G

Leases") in the absence of a surrender clause or release permitting the lessee to terminate the Lease at will and despite provisions in the Leases treating the lessee's actions as breach of the rights of the overriding royalty interest owners. I would hold that appellants, Stroud Production, L.L.C. ("Stroud Production"), Plantation Petroleum Corporation ("Plantation"), and Robert A. Stroud, (collectively, the "Stroud Defendants") conspired to and did tortiously interfere with contracts (the "Assignments") assigning overriding royalty interests ("ORRIs") in the production from the B&G Leases to appellees, Patrick E. Hosford, Morris L. Etheridge, David T. Threinen, and Nelson E. Woods (collectively the "Assignees" or the "ORRI Owners") by causing appellant Plantation, the Lessee in the B&G Leases, to breach obligations owed to the ORRI Owners under the Leases and to repudiate the Leases, washing out the royalty interests of the ORRI Owners and converting the royalties due the ORRI Owners under the B&G Leases to the Stroud Defendants' own benefit.

I would affirm the judgment in favor of appellees, the ORRI Owners.

### The ORRI Assignments and the Bowers and Gordon Leases

As the majority states, in June 1978, the Houston Domestic Oil Company ("HDOC"), of which Hosford was president, obtained the B&G Leases: two oil and gas leases on a 50 acre parcel of land in Galveston County, Texas. Hosford signed the B&G Leases in his capacity as president of HDOC. The Lessors,

2

Bowers and Gordon, retained a 25% royalty interest and the original Lessee, HDOC, obtained a 75% working interest.

Also in 1978, HDOC assigned to Hosford, Etheridge, Threinen, and Woods, by separate individual Assignment contracts, a 5% overriding royalty interest, or ORRI, in production from the B&G Leases. Each of the Assignments was executed by an officer of HDOC and recited that it was conveyed "[f]or and in consideration of Ten and No/100ths Dollars ($10.00) and other good and valuable consideration."

The Assignments "transfer[red,] assign[ed,] and convey[ed]" to the Assignees, "under the terms and conditions hereinafter set forth, the following described overriding royalty interests on and with respect to oil and gas produced pursuant to the following described Oil and Gas Leases." The referenced B&G Leases contained a number of provisions material to this appeal, including the assignment provisions.

First, both of the B&G Leases granted an ownership interest in the land described by the Leases "exclusively unto said Lessee [HDOC] for the sole and only purpose of investigating, exploring, prospecting, drilling and operating for, developing and producing oil and gas."

3

Both of the Leases had a primary term of one year and were to remain in effect thereafter for so long as oil or gas was produced in commercial quantities. Both further provided,

> If within thirty (30) days prior to the expiration of the primary term hereof, or at any time or from time to time after the expiration of the primary term hereof, oil or gas is being produced from said lands, or from lands pooled therewith, and all such production ceases and this lease is not otherwise continued in force, this lease shall not terminate if additional drilling or reworking operations are commenced or resumed on said lands, or on lands pooled therewith, within ninety (90) days after such cessation of production, and this lease shall continue in force so long as any such operations on the same or successive wells are prosecuted with no cessation of more than ninety (90) consecutive days; and, if such operations result in production of oil or gas, then this lease shall, subject to the other provisions hereof, continue in force as long thereafter as oil or gas is produced from said lands, or from lands pooled therewith, in commercial quantities.

Each Lease further provided,

> If the Lease is not being maintained in force and effect by continuous drilling or reworking operations after the expiration of the primary term, as above provided, then this lease shall automatically terminate as to said lands, SAVE AND EXCEPT from the surface down to 100 feet below the stratigraphic equivalent of the deepest producing zone or formation in and under:

>> (1) each well situated on said lands producing oil in paying quantities "together with forty (40) acres around such well, and such remaining acreage after completion of the first well thereon as is included in an oil unit formed pursuant to the provisions hereof. . . .

In addition, each Lease provided,

> *Should Lessee be prevented* from complying with any expressed or implied covenant of this lease, from conducting drilling or reworking

4

operations on said lands, or *from produc[tion] of oil or gas therefrom by reason of scarcity or inability, after effort made in good faith to obtain equipment or material*, or authority to use same, or by failure of carriers to transport or furnish facilities for transportation, or by operations of force majeure, or federal or state law, or any cause beyond Lessee's control, *then, while so prevented, Lessee's obligation to comply with such covenant shall be suspended and Lessee shall not be liable for damages for failure to comply therewith*, and this lease shall be extended while and so long as Lessee is prevented by any such cause from conducting drilling or reworking operations on or from producing oil or gas from said lands and the time while Lessee is so prevented shall not be counted against Lessee. . . .

(Emphasis added). Each Lease provided that it be recorded in the appropriate records of the county in which the Lease was located, and the Leases were so recorded.

Finally, both of the B&G Leases provided that the rights of either party to the Lease could be "assigned in whole or in part and as to any mineral covered hereby and to any extent, and the provisions hereof shall extend to their heirs, successors and assigns. . . ." The assignment provision concluded:

*In the event of assignment or sublease hereof*, in whole or in part, *liability for breach of any obligation expressed or implied hereunder shall rest exclusively upon the owner or sublessee* of this lease or a portion thereof *who commits such breach. Drilling or production on any portion of said lands shall inure to the benefit of the owners of this lease and of any and all portions thereof.*

(Emphasis added).

The ORRI Assignments were all executed pursuant to this provision, and, therefore, by virtue of those Assignments, production on any portion of the B&G

5

Leases inured to the Assignees' benefit as part owners of the Leases, and any breach of an express or implied obligation under the Leases rested exclusively upon the owner or sublessee of the Lease, or a portion of it, who committed the breach.

As the majority states, HDOC drilled wells that produced oil in commercial quantities, and the ORRI Owners, according to their Assignments, received payments for their overriding royalty interests in the B&G Leases from 1978 until the end of December 2003, when Plantation acquired the B&G Leases after a number of assignments of ownership interests in the intervening years.

Promptly upon Plantation's acquiring the Bowers and Gordon Leases, the sole existing well on the B&G Leases "collapsed," the Stroud Defendants, acting through Plantation, terminated the B&G Leases, ceased paying royalties to the ORRI Owners, and entered new leases that excluded the ORRI Owners, washing out their interest. This litigation ensued.

Following trial, the jury found that (1) Plantation failed to comply with the agreement to pay the ORRI Owners overriding royalties from the B&G Leases for January 2004; (2) Plantation "intentionally terminate[d] the [B&G] Leases to destroy [the ORRI Owners'] rights to their overriding royalty interests"; (3) Plantation converted the ORRI Owners' "proceeds from their overriding royalty interests" in the B&G Leases; (4) Stroud Production intentionally interfered with

6

the ORRI Owners' rights to receive their overriding royalties under the B&G Leases; (5) Stroud was responsible for the conduct of both Plantation and Stroud Production; (6) Stroud Production and Stroud conspired with Plantation with the "intent to deprive [the ORRI Owners] of the proceeds from their overriding royalty interests"; and (7) Stroud and Stroud Production conspired to damage the ORRI Owners. In a single damages question, the jury was asked to calculate an amount that would reasonably compensate the ORRI Owners for damages caused by the loss of the "unpaid overriding royalties from the [B&G] Leases" for three periods: January 1, 2004 to January 20, 2004, before production on the B&G Leases ceased, and from January 21, 2004 to January 1, 2007, and January 1, 2007 to the present, after the termination of the B&G Leases and their replacement by new leases on the same land. In its final judgment, the trial court awarded the ORRI Owners the damages found by the jury, together with pre-judgment interest and attorney's fees, including appellate attorney's fees. This appeal followed.

## Tortious Interference and Breach of Contract

In their first issue, the Stroud Defendants argue that the trial court erred in entering judgment in favor of the ORRI Owners on their claim of "intentional termination" of their rights because (1) no such claim exists under Texas law; (2) Plantation, as Lessee of the B&G Leases, had no contractual obligation to perpetuate the B&G Leases for the benefit of the ORRI Owners; (3) Plantation

7

owed no fiduciary duty and had no special relationship with the ORRI Owners; (4) there are no "public policy reasons for the creation of a new fiduciary duty" owed to the ORRI Owners; and (5) "the retroactive application of a fiduciary obligation" in this case "would be inequitable given Plantation's reliance on settled Texas law."

The Stroud Defendants further argue that (6) the ORRI Owners' "intentional termination" claim is not supported by legally or factually sufficient evidence because the B&G Leases expired "according to their terms" and not as a result of an intentional act committed by Plantation, and (7) the trial court erred in submitting to the jury the question on the ORRI Owners' claim for intentional termination because the question "lacked sufficient instructions to provide a standard to guide the jury in assessing the conduct of Plantation."

In their fourth issue, the Stroud Defendants argue that the trial court erred in entering judgment in favor of the ORRI Owners based upon their tortious interference claim because Plantation "never objected to the actions of its agent Stroud Production"; "the collapse" of the existing well on the B&G leases "cannot be attributed to Stroud Production"; and there was no evidence that the Stroud Defendants "sabotaged" the well. The Stroud Defendants assert that "although Stroud Production did not repair the well after its collapse, tortious interference requires a willful act."

8

In reply, the ORRI Owners argue that Stroud Production "made decisions about the lease" and interfered with its "contractual relationship" with Plantation, the Lessee, causing the washing out of their ORRIs. They also assert that the jury could have found that the failure of the only well that was sustaining the B&G Leases was not "coincidental" and that Stroud Production, as the operator, "willfully and intentionally interfered" with their ORRIs.

In sum, the Stroud Defendants contend that Plantation, as Lessee of the B&G Leases, had no contractual or fiduciary duty to the ORRI Owners under the B&G Leases or the Assignments with which the Stroud Defendants could wrongfully interfere and that Plantation had a legal right to repudiate the B&G Leases and wash out the Assignees' ORRIs without breaching or causing the breach of any duty owed to the ORRI Owners and without incurring any obligation or liability to them. The ORRI Owners deny those claims and contend that the evidence shows otherwise.

I would hold that the Stroud Defendants' argument that they are entitled to reversal of the judgment in favor of the ORRI owners because there is no cause of action for intentional termination of an oil and gas lease is without merit. The unjustified, willful, and intentional interference with the contractual rights of another by causing breach and repudiation of a contract in violation of the legal rights of the other constitutes the well-recognized cause of action for tortious

9

interference with contract, which subsumes the other issues pled and tried in this case and on which the ORRI Owners obtained a jury verdict. I would turn to the merits of the Stroud Defendants' claims on appeal that they did not tortiously interfere with the ORRI Owners' contractual rights under the Assignments and the B&G Leases by causing the breach of those contracts.

## A.   *Applicable Law*

This case concerns alleged tortious interference with contracts assigning ORRIs in the B&G Leases.

### 1.   *ORRIs and oil and gas leases*

An "overriding royalty interest" is defined in Texas law as "an interest which is carved out of, and constitutes a part of, the working interest created by an oil and gas lease." *In re GHR Energy Corp.*, 972 F.2d 96, 99 (5th Cir. 1992) (quoting *Gruss v. Cummins*, 329 S.W.2d 496, 501 (Tex. Civ. App.—El Paso 1959, writ ref'd n.r.e.)); *EOG Res., Inc. v. Hanson Prod. Co.*, 94 S.W.3d 697, 701 (Tex. App.—San Antonio 2002, no pet.). "Specifically, it is the share of the oil or gas produced reserved in assignment, part assignment, or sublease of an oil and gas lease payable to the assignor by the assignee over and above the royalty reserved in the lease payable to the lessor." *EOG Res.*, 94 S.W.3d at 701. Overriding royalty interests are ownership interests in land. *See id.* ("An overriding royalty is an interest in real property regarded as a covenant running with the land between the

10

assignor and the assignee, and is enforceable by the assignor against the assignee.") (citing *Phillips Petroleum Co. v. Taylor*, 116 F.2d 994, 995 (5th Cir. 1941)); *Renwar Oil Corp. v. Lancaster*, 276 S.W.2d 774, 776 (Tex. 1955) ("[A]n oil and gas lease is . . . a conveyance of realty. . . ."); *Gruss*, 329 S.W.2d at 500 (stating that ORRI "is an interest in land").

Under Texas law, an oil and gas lease is not a "lease" in the traditional sense of a lease of the surface of real property. *Natural Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 192 (Tex. 2003); *Chesapeake Exploration, L.L.C. v. Dallas Area Parkinsonism Soc'y, Inc.*, No. 07-10-0397-CV, 2011 WL 3717082, at *4 (Tex. App.—Amarillo Aug. 24, 2011, no pet.) (mem. op.). Instead, "[i]n a typical oil and gas lease, the lessor is a grantor and grants a fee simple determinable interest to the lessee, who is actually a grantee." *Natural Gas Pipeline Co.*, 124 S.W.3d at 192; *Chesapeake Exploration, L.L.C.*, 2011 WL 3717082, at *4. The lessee's interest is "determinable" "because it may terminate and revert entirely to the lessor/grantor upon occurrence of events that the lease specifies will cause termination of the estate." *Natural Gas Pipeline Co.*, 124 S.W.3d at 192; *Chesapeake Exploration*, 2011 WL 3717082, at *4 n.3. "The intention of the parties to a mineral lease is that minerals shall be produced from the land leased, and shared as therein specified." *Parker v. Standard Oil Co. of Kansas*, 250 S.W.2d 671, 680 (Tex. Civ. App.—Galveston 1952, writ ref'd n.r.e.).

11

An ORRI "is necessarily derived from a particular oil and gas lease which constitutes the assignor's mineral estate, and its validity is subject to the terms, conditions and existence of such a lease. . . . [I]t is the lease which denotes the life and breadth of the estate to be assigned." *Gruss*, 329 S.W.2d at 501. Generally, grantees and assignees under an oil and gas lease become bound by the contractual obligation of their predecessors in title. *McCormick v. Krueger*, 593 S.W.2d 729, 730–31 (Tex. Civ. App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.). However, an ORRI created by assignment does not survive termination of the assigned oil, gas, or mineral rights lease unless the instrument creating the interest expressly provides otherwise. *EOG Res.*, 94 S.W.3d at 703 (holding that ORRI survived termination of oil and gas lease where assignment provided that overriding royalty would burden any extensions or renewals taken within one year of termination of underlying leases).

Rather than being a "lease" in the traditional sense, an oil and gas lease is a contract, and it is therefore interpreted as such. *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005). In construing a written contract, the courts examine the contract in its entirety in order to harmonize and give effect to all of its provisions so that none will be rendered meaningless. *EOG Res.*, 94 S.W.3d at 701. When two or more instruments make up a single transaction, as with the

12

Assignments and the underlying B&G Leases in this case,[1] they are construed together as one contract. *See id.*

The language in a contract must be given its plain grammatical meaning unless to do so would defeat the parties' intent. *Baty v. Protech Ins. Agency*, 63 S.W.3d 841, 848 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). When a written contract is clear and certain, the instrument will be deemed to express the intent of the parties and will be enforced as written, no matter what the actual intent may have been. *EOG Res.*, 94 S.W.2d at 701. Accordingly, the courts will enforce the intentions of the parties to an unambiguous oil and gas lease as expressed in the lease. *Tittizer*, 171 S.W.3d at 860.

Whether a contract is ambiguous is a question of law for the court. *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 282 (Tex. 1996). If a contract is worded so that it can be given a definite or certain legal meaning, then it is not ambiguous. *Id.* When a dispute arises from the terms of an unambiguous contract, the court can determine the parties' rights and obligations under the agreement as a matter of law. *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997).

---

[1] *See In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004) (orig. proceeding) ("[A]n unsigned paper may be incorporated by reference in the paper signed by the person sought to be charged. The language used is not important provided the documents signed by the defendant . . . plainly refers to another writing") (quoting *Owen v. Hendricks*, 433 S.W.2d 164, 166 (Tex. 1968)).

## 2. *Tortious interference*

"A party to a contract has a cause of action for tortious interference against any third person who wrongly induces another contracting party to breach the contract." *Swank v. Sverdlin*, 121 S.W.3d 785, 799 (Tex. App.—Houston [1st Dist.] 2003, pet. denied); *see Holloway v. Skinner*, 898 S.W.2d 793, 794–95 (Tex. 1995). The elements of a cause of action for tortious interference with a contract are: "(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damage or loss." *Prudential Ins. Co. of Am. v. Fin. Review Serv., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *see Holloway*, 898 S.W.2d at 795–96; *Funes v. Villatoro*, 352 S.W.3d 200, 213 (Tex. App.—Houston [14th Dist.] 2011, pet. denied); *Swank*, 121 S.W.3d at 800. To prevail on a tortious interference claim, the plaintiff must present evidence that the defendant interfered with a specific contract. *Funes*, 352 S.W.3d at 213. To establish the element of an act of willful and intentional interference, the plaintiff must produce some evidence that the defendant was more than a willing participant and knowingly induced one of the contracting parties to breach its obligations under the contract. *Id.* To do so, the plaintiff must present evidence that an obligatory provision of the contract was breached. *Id.* If there is any evidence of probative force supporting a

14

finding of tortious interference, the court is required to uphold the jury's verdict on appeal. *See ACS Investors*, 943 S.W.2d at 430.

As an affirmative defense, a defendant may negate liability for tortious interference on the ground that its conduct was privileged or justified. *Prudential*, 29 S.W.3d at 80; *see also Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 727 (Tex. 2001) (holding that defendant who induces breach of contract must show some justification or privilege for depriving another of benefits to which agreement entitled him). Merely inducing an obligor under a contract to do what it has a right to do is not actionable interference. *Baty*, 63 S.W.3d at 857; s*ee ACS Investors*, 943 S.W.2d at 431.

A party is privileged to interfere with the contractual relations of another if (1) it acts in the bona fide exercise of its own right, or (2) it has an equal or superior right in the subject matter to that of the party to the contract. *Baty*, 63 S.W.3d at 57; *see Prudential*, 29 S.W.3d at 80–81. "[T]he justification defense can be based on the exercise of either (1) one's own legal rights or (2) a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken." *Prudential*, 29 S.W.3d at 80. Whether an alleged act of tortious interference was privileged or the exercise of a colorable act is a question of law for the court. *Id.* Generally, justification is established as a matter of law if the acts of which the plaintiff complains are merely the defendant's exercise of its own

15

contractual rights. *Id.* at 81. This is true regardless of the defendant's motive. *Tex. Beef & Cattle Co. v. Green*, 921 S.W.2d 203, 211 (Tex. 1996); *Baty*, 63 S.W.3d at 857. "The issue of the defendant's good faith is pertinent only if the court determines that the defendant had a colorable right, but not a privilege, to engage in the conduct claimed to have interfered with a contract." *Prudential*, 29 S.W.3d at 80; *see Tex. Beef & Cattle Co.*, 921 S.W.2d at 211. A jury question is presented only when the court decides that "although no legal right to interfere exists, the defendant has nevertheless produced evidence of a good faith, albeit mistaken, belief in a colorable legal right." *Tex. Beef & Cattle Co.*, 921 S.W.2d at 211.

### B.    *Application of the Law*

The Stroud Defendants argue—and the majority agrees—that even though the B&G Leases contained no "surrender clause" or release, the Lessee, Plantation, had the legal right to terminate the Leases at any time by causing production to terminate on the only producing well, or, at least, by acquiescing in the cessation of production from the well, without taking any steps to restore production, with the intent of washing out the interests of the ORRI Owners. They further argue that Plantation had the right to declare the B&G Leases terminated under their own terms after ninety days had passed without production, or even during the ninety days in which production had ceased, and to induce the Lessors, Bowers and

16

Gordon, to enter new leases on the same land and additional land on terms more advantageous to the Stroud Defendants, washing out the interests of the ORRI Owners and ending the payment of royalties to them. The Stroud Defendants contend—and the majority agrees—that they neither violated any legal or equitable right of the ORRI Owners by their actions nor caused any party to the B&G Leases to violate any obligation owed to the ORRI Owners. They argue that their actions were justified and could not constitute tortious interference with the ORRI Owners' rights as a matter of law. These contentions are, however, belied by the terms of the B&G Leases and the Assignments.

Despite the Stroud Defendants' contention that the B&G Leases granted no rights to the ORRI Owners enforceable against Plantation, each of the Leases expressly provided that the rights of the Lessee, "as to any mineral covered hereby" could be assigned and that "the provisions hereof shall extend to their heirs, successors and assigns . . . ." The assignment provision also expressly stated that "[d]rilling or production on any portion of said lands shall inure to the benefit of the owners of this lease and of any and all portions thereof" and that, "[i]n the event of assignment or sublease hereof, in whole or in part, liability for breach of any obligation expressed or implied hereunder shall rest exclusively upon the owner or sublessee of this lease or a portion thereof who commits such breach."

17

In short, drilling and production on the B&G Leases inured to the benefit of the ORRI Owners, as assignees of a portion of the Lessee's mineral rights, the provisions of the Leases extended to them, and liability for any breach of the provisions of the B&G Leases rested exclusively upon the breaching party. Therefore, the question for this Court is whether the Stroud Defendants willfully and intentionally caused the Lessee, Plantation, to breach any of the provisions of the Assignments or the B&G Leases that inured to the benefit of the ORRI Owners, or whether the Stroud Defendants, including Plantation, had a legal right to act as they did that overrode any rights of the ORRI Owners.

Critically, as was pointed out in the majority opinion, none of the documents relevant to this dispute—neither the B&G Leases nor the Assignments—contained a "surrender clause," i.e., a clause that would have provided that a future Lessee, as assignee of HDOC's interests in the B&G Leases, "would be under no obligation to keep the lease in force by payment of rentals, by drilling, or by development operations, and that assignee should have 'the right to surrender any or all part of such leased acreage without the consent of assignor.'" *See Sunac Petroleum Corp. v. Parkes*, 416 S.W.2d 798, 800 (Tex. 1967) (describing lease with surrender clause). Thus Plantation had no such clause upon which to rely to excuse its failure to perform in accordance with the terms of the B&G Leases.

Instead of a clause that permitted Plantation to allow the B&G Leases to lapse without the consent of the ORRI owners, the B&G Leases imposed a number of obligations on Plantation as the Lessee that inured to the ORRI Owners' benefit and were not excused by any agreement.

Specifically, each of the B&G Leases provided for exclusive access to the Lease by the Lessee "for the sole and only purpose of investigating, exploring, prospecting, drilling and operating for, developing and producing oil and gas." After the end of the primary term of one year, each Lease provided that it was to remain in effect thereafter for so long as oil or gas was produced in commercial quantities. Each Lease further provided that it would not terminate so long as oil or gas was being produced from land subject to the B&G Leases; that, even if all production ceased and the Lease was not otherwise continued in force, the Lease would not terminate if additional drilling or reworking operations were "commenced or resumed on said lands, or on lands pooled therewith, within ninety (90) days after such cessation of production"; and that, if these operations resulted in the production of oil or gas, the B&G Leases would "continue in force as long thereafter as oil or gas is produced from said lands, or from lands pooled therewith, in commercial quantities."

In addition, each Lease provided that if it were not maintained in force and effect by continuous drilling or reworking operations, it would automatically

19

terminate *except* "from the surface down to 100 feet below the stratigraphic equivalent of the deepest producing zone or formation in and under" each producing well "together with forty (40) acres around such well, and such remaining acreage after completion of the first well thereon as is included in an oil unit formed pursuant to the provisions hereof. . . ."

Finally, both of the B&G Leases provided:

> Should Lessee be prevented from complying with any expressed or implied covenant of this lease, from conducting drilling or reworking operations on said lands, or from producing of oil or gas therefrom by reason of . . . inability, after effort made in good faith to obtain equipment or material, . . . or any cause beyond Lessee's control, then, while so prevented, Lessee's obligation to comply with such covenant shall be suspended and Lessee shall not be liable for damages for failure to comply therewith, and this lease shall be extended while and so long as Lessee is prevented by any such cause from conducting drilling or reworking operations on or from producing oil or gas from said lands, and the time while Lessee is so prevented shall not be counted against Lessee. . . ."

In short, in accepting the rights and obligations of the Lessee under the B&G Leases, Plantation obligated itself to develop the Leases and to conduct drilling, producing, and reworking operations on them unless prevented "by reason of scarcity or inability, after effort made in good faith to obtain equipment or material," or by any other "cause beyond Lessee's control." So long as its obligation to develop and operate the Leases was prevented by such causes beyond its control, the Lessee's obligations were *suspended*, not terminated; the Leases continued in force and effect; and the Lessee was not liable for breach. However,

20

if the Lessee was not so prevented, its actions in violation of any express or implied covenant were counted against it as breaches for which it would be liable to the owner of any portion of the Leases, including the ORRI Owners.

The Texas Supreme Court has recognized each of the covenants reflected in the B&G Leases as binding. In *HECI Exploration Co. v. Neel*, it stated:

> A covenant will not be implied unless it appears from the express terms of the contract that 'it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it,' . . . or 'it must appear that it is necessary to infer such a covenant in order to effectuate the full purpose of the contract as whole as gathered from the written instrument.

982 S.W.2d 881, 888 (Tex. 1998) (quoting *Danciger Oil & Ref. v. Powell*, 154 S.W.2d 632, 635 (Tex. 1941)). It further stated, "Broadly categorized, we have recognized implied covenants to (1) develop, which means to drill an initial well and to reasonably develop the lease, (2) protect the leasehold, which includes protection from local and field-wide drainage, and (3) manage and administer the lease." *Id.* at 889. Finally, it held that the extent of the lessee's *implied* duties is governed by the concept of what a reasonably prudent operator would do to carry out the purposes of the lease. *Id.* Similarly, the extent of the lessee's *express* duties is governed by the plain language of the agreement in its entirety, and the language is enforced as written. *See EOG Res.*, 94 S.W.2d at 701.

Here, the plain language of the B&G Leases required Plantation to develop the Leases, protect the leasehold, and manage and administer the Lease in the

21

interests of the parties to them—necessarily, as a prudent operator would. Nevertheless, well before the ninety-day non-continuous operations period expired, the Stroud Defendants repudiated their obligations to the ORRI Owners under the B&G Leases, washed out the ORRI Owners, obtained new leases of the *same* acreage from the B&G Lessors, lined up new investors, and, immediately upon the expiration of ninety days, restarted production from the *same* well and developed the forty acres surrounding the well for its own benefit and the benefit of the new owners to the harm of the ORRI Owners, whose ORRIs under the terms of the B&G Leases were not paid to them.[2]

On these facts, the jury found that Plantation, at the instigation of and with the active participation of the other Stroud Defendants, intentionally breached the B&G Leases and induced Bowers and Gordon to agree to terminate the B&G Leases and enter new ones on the same land, even before ninety days of non-production had expired. Plantation's stated purpose, at least in part, was to wash out the contractual legal rights of the ORRI Owners—whose interests Plantation and the other Stroud Defendants treated as likewise terminated, despite the lack of

---

[2]     I do not dispute the right of the Stroud Defendants to induce the Lessors, Bowers and Gordon, to agree to terminate the B&G Leases as to their own interests and to enter new leases on the same land on terms more favorable to themselves. *See ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 431 (Tex. 1997) (merely inducing obligor under contract to do what it has right to do in not actionable as intentional interference with contract).

such an agreement—to the Stroud Defendants' substantial benefit and the ORRI Owners' harm.

Plantation had no legal right to cause production to cease or to fail to make good faith efforts to obtain equipment or material to produce oil or gas, even if production were prevented by a cause beyond its control. Nor did it, or its decision-maker, Stroud, have a right, upon Plantation's failing to comply with the express and implied covenants in the B&G Leases, to declare the Leases terminated as to the ORRI Owners, to cease paying royalties to the ORRI owners, and to enter new leases more advantageous to themselves and harmful to the ORRI Owners' interests, without their actions being counted as breach under the terms of the B&G Leases. Plantation's legal obligations as Lessee to develop, protect, administer, and maintain the B&G Leases in the interests of all the owners, including the ORRI Owners, were clear and unambiguous. Likewise, the ORRI Owners' right to a percentage of the production from the Leases, as provided in the B&G Leases and the Assignments, was clear and unambiguous.

As the majority states, it is undisputed that HDOC drilled wells on the B&G Leases that produced oil in commercial quantities and that the ORRI Owners received overriding royalties according to their Assignments of rights under the B&G Leases from 1978 until January 2004, immediately after Plantation acquired the Leases, even though ownership of the B&G Leases had changed hands multiple

23

times during the years. In other words, all prior Lessees had recognized their obligations to perform under the B&G Leases and the Assignments in the interest of the owners of interests in the Leases. Only the Stroud Defendants willfully and intentionally chose to cause Plantation to cease performance and to enter new leases by the actions described in the majority opinion. I disagree with the majority that Plantations' actions of washing out the ORRI Owners' interests while the B&G Leases were in force and effect actions could excuse Plantation's obligations to the ORRI Owners under their Agreements. These actions were without legal justification and in violation of the ORRI Owners' rights under the Assignments and the B&G Leases.

The Stroud Defendants contend that the B&G Leases expired by their own terms due to Plantation's ceasing production or causing production to cease and by their failing, intentionally, to make a good faith effort to obtain equipment or material to repair the well and restore production until ninety days had passed and new leases had been obtained that washed out the ORRI Owners' rights. At that point, the Stroud Defendants promptly restored production from the well and began additional operations on the same land without paying royalties to the ORRI Owners.

However, the B&G Leases had not expired by their own terms. Their own terms required that Plantation not cause production to cease by actions within its

24

control and that it make good faith efforts to restore production when it ceased from causes beyond its control. The B&G Leases contained no terms relieving Plantation from liability for production lost when the cessation of production was within its control or when it had failed to make good faith efforts to obtain equipment and material to restore production. Instead, Plantation was expressly made liable to the ORRI Owners for any breach of the foregoing obligations.

Moreover, the B&G Leases provided that if they were not being "maintained in force and effect by continuous drilling or reworking operations" as provided in the Leases, they would "automatically terminate SAVE AND EXCEPT from the surface down to 100 feet below the stratigraphic equivalent of the deepest producing zone or formation in and under" each producing well, "together with forty (40) acres around such well, and such remaining acreage after completion of the first well thereon as is included in an oil unit formed pursuant to the provisions hereof. . . ." Therefore, under their own terms, the B&G Leases did not expire as to the ORRI Owners when Plantation intentionally ceased production without reaching an agreement with them to terminate the Leases, refused to pay them royalties owed for January 2004, and refused to recognize their right to royalties on production from the restored well and other wells within forty acres.

I would hold that the B&G Leases terminated as to the Lessors, Bowers and Gordon, by their agreement to terminate the B&G Leases and to enter new ones.

25

*See Ridge Oil Co. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 152–53 (Tex. 2004); *Sasser v. Dantex Oil & Gas, Inc.*, 906 S.W.2d 599, 603 (Tex. App.—San Antonio 1995, writ denied). They did not terminate as to the right of the ORRI Owners to receive royalties from the producing well on the B&G Leases or on production from 100 feet beneath that well or on the surrounding forty acres, under the express terms of the B&G Leases. *See Ridge Oil*, 148 S.W.3d at 153 n.33 (citing *Shell Oil Co. v. Stansbury*, 401 S.W.2d 623, 633 (Tex. Civ. App.—Beaumont 1966, writ ref'd n.r.e.) (holding that purported releases of particular sands not authorized by lease could not be effective except by mutual agreement of lessee and lessors)); *Cain v. Neumann*, 316 S.W.2d 915, 919–20 (Tex. Civ. App.—San Antonio 1958, no writ) (holding that terms of base lease declared that continued production of mineral maintained base lease in force regardless of ownership of mineral rights, and release by lessee of its interest, which successors to original lessors, accepted could not affect right of other owners "so long as production in fact continues").

Because (1) the Assignments of ORRIs to the ORRI Owners constituted contracts subject to interference by wrongful termination of the underlying B&G Leases, from whose terms their right to overriding royalties derived and from compliance with which the royalties themselves derived; (2) the Stroud Defendants committed willful and intentional acts of interference with the ORRI Owners' contractual rights under the Leases and Assignments; (3) the Stroud Defendants'

26

acts of interference were a proximate cause of the ORRI Owners' failure to receive the overriding royalties due them under the B&G Leases and the Assignments in accordance with their contractual rights, and (4) the ORRI Owners suffered actual damage or loss from the Stroud Defendants' interference with their rights, I would further hold that the jury correctly found that the Stroud Defendants tortiously interfered with the legal rights of the ORRI owners, to their harm. *See Prudential*, 29 S.W.3d at 77; *Holloway*, 898 S.W.2d at 795–96; *Funes*, 352 S.W.3d at 213.

The Stroud Defendants cannot point to any legal justification for their actions in the superior legal right, such as that afforded by a surrender clause or release, for their acts of tortious interference committed against the ORRI Owners. Rather, their numerous acts of breach manifest their willful and intentional disregard of the legal obligations of the Lessee, Plantation, and of the legal rights of the ORRI Owners.

Nor can the Stroud Defendants rely on the defense that they had a mistaken "colorable legal right" to act as they did because they relied on information received by their landman and on the advice of legal counsel in doing so. As stated above, a jury question is presented when the court decides that "although no legal right to interfere exists, the defendant has nevertheless produced evidence of a good faith, albeit mistaken, belief in a colorable legal right." *Tex. Beef & Cattle Co.*, 921 S.W.2d at 211. Here, there was no evidence of a good faith belief in a

27

colorable legal right on the part of the Stroud Defendants to act as they did to wash out the ORRI Owners. Nor could there be one, because the rights of the ORRI Owners that they intentionally breached and caused to be breached, purportedly in reliance on legal advice, were all unambiguously set out in the Assignments and the B&G Leases. Parties who sign a lease "are charged with knowledge of all the lease provisions absent some claim that they were tricked into agreeing to them." *See In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 134 (Tex. 2004) (orig. proceeding); *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex. 1962) ("[P]arties to a contract have an obligation to protect themselves by reading what they sign.").

## C.      *The Majority's Construction of Case Law*

Because the Stroud Defendants could not have had a good faith colorable belief in the legality of their actions as a matter of law, the question of whether they breached the underlying B&G Leases and tortiously interfered with the rights of appellants under the Assignments was a question for the jury. Any evidence of probative force supporting a finding of tortious interference requires the court to uphold the jury's verdict on appeal. *See ACS Investors*, 943 S.W.2d at 430. I would hold that there was sufficient evidence to support the jury's verdict in the ORRI owners' favor on their claims of tortious interference and all related and intertwined claims of breach and "intentional termination."

28

The majority agrees that the record contains evidence supporting a finding that the Stroud Defendants "intentionally terminated" the B&G leases, at least in part, to "destroy" the ORRI Owners' ORRIs in the B&G leases. However, the majority ignores the contractual duties of the Stroud Defendants under the B&G Leases and the common-law duty not to tortiously interfere with the legal rights of another without legal justification. Instead, construing a number of Texas cases in which an ORRI holders' rights have been at issue, the majority agrees with the Stroud Defendants' contention that they had no contractual or fiduciary duties to the ORRI Owners in the B&G Leases and that the ORRI Owners had no legal rights under either the B&G Leases or the Assignments subject to tortious interference by the Stroud Defendants.

I construe the case law differently—in particular, the two most closely analogous cases, *Sunac Petroleum*, 416 S.W.2d 798, and *Ridge Oil*, 148 S.W.3d 143.

In *Sunac*, Parkes, the original lessee, sold and assigned to a third party a mineral lease that was later transferred to Sunac. 416 S.W.2d at 799. Parkes reserved for himself an ORRI in production from this lease and "any extension or renewal," but Parkes' assignment of this lease to Sunac also included a surrender clause, relieving Sunac of any obligation to continue the lease. *Id.* The surrender clause provided that Sunac "would be under no obligation to keep the lease in

29

force by payment of rentals, by drilling, or by development operations, and that assignee should have 'the right to surrender any or all part of such leased acreage without the consent of assignor [Parkes].'" *Id.* When the lessor questioned the validity of the lease held by Sunac, Sunac procured a new lease on the same land, but with different terms, and Sunac stopped paying the overriding royalties owed to Parkes under the original lease. *Id.* at 800. Parkes contended that his ORRI applied to the new lease. *Id.*

After considering the language of the leases, the supreme court concluded that the original lease had terminated and that the new lease, which was executed on "substantially different" terms, was not a renewal or extension. *Id.* at 802–03. The most important factor was the surrender clause in the assignment from Parkes to Sunac, under which Parkes' ORRI interest arose. *See id.* at 804.

The situation in *Sunac* is the exact opposite of this case, in which there was no surrender clause. Here, HDOC, the original Lessee, had assigned portions of its interest to the ORRI Owners many years before the remaining interests were assigned to Plantation in 2003. The Assignments expressly granted the ORRI Owners the protections of an owner of an interest in the Leases, including the right to payment of overriding royalties on production from the Lease, the right to performance of the obligations imposed on the Lessee by the express and implied covenants in the B&G Leases, and the right to a continuing ownership interest in

30

production from the forty acres surrounding any well on the Leases that had expired from cessation of production for more than ninety days.

As the majority states, the supreme court observed in *Sunac* that other courts had offered protection to ORRI holders in a "washout transaction" that "involve[d] some bad faith on the part of the lessee," such as when a new lease was taken before the expiration of the original and the original lease was "simply permit[ted] . . . to expire"—exactly as happened here. *Id.* at 804 (citing *Oldland v. Gray*, 179 F.2d 408, 414–16 (10th Cir. 1950)). The supreme court also stated in *Sunac* that the provisions of the leases and the assignment were "controlling." *Id.* at 805. Applying that law in this case, I would hold that the Stroud Defendants clearly breached the provisions of the B&G Leases and the Assignments protecting the ORRI Owners' interests in bad faith and that the ORRI Owners are entitled to recover damages for the breaches.

*Ridge Oil* is likewise distinguishable. In *Ridge Oil*, two lessees, Ridge and Guinn, obtained working interests in adjoining tracts of land under a single base lease. 148 S.W.3d at 147–48. The only two producing wells on the entire lease, which were sustaining the lease, were located on the Ridge tract. *Id.* at 147. Ridge devised a plan to terminate the underlying base lease and to obtain new leases on both tracts by shutting off the electricity to the two producing wells for ninety days. *Id.* at 148. After Ridge effectuated his plan and obtained new leases, Guinn

31

sued Ridge for tortious interference, contending, in part, that Ridge could not lawfully wash out its interest. *Id.* at 148–49, 153. Guinn further contended that a lessee could not lawfully surrender or terminate a lease "to destroy the rights of another partial assignee of the lessee's interest." *Id.* at 155.

Without expounding upon the base lease's provisions, the supreme court in *Ridge Oil* concluded that Ridge owed no duty to Guinn to continue the original base lease or to procure its renewal or extension for Guinn and, thus, the original lease terminated by its own terms. *Id.* at 155–56, 160–61. Thus, there was no basis for a tortious interference claim. *Id.* at 161. The court justified its denial of Guinn's claim for tortious interference by distinguishing the situation in that case, where both parties were successor lessees to an original base lease, from the situation of ORRI Owners, such as those in this case, stating:

> Even if such a rule of law might be appropriate in the context of overriding royalty interests when the underlying lease does not contain an express release provision, a question we do not address, there is a material distinction between an overriding royalty interest and that of a lessee. An overriding royalty interest is a non-participating interest. A royalty owner has no right and thus no ability to go onto the underlying property and drill or otherwise take action to perpetuate a lease. An overriding royalty interest owner is wholly dependent on the lessee to keep a lease alive. That is not true of a lessee. A lessee in Guinn's position could continue a lease in effect by drilling a well and obtaining production, or continuing operations until production is obtained, under lease provisions like those in the 1937 lease.

*Id.* at 155.

32

Here, the ORRI Owners had no right to enter the B&G Leases or to develop, protect, maintain, and administer them. Rather, the B&G Leases granted an ownership interest in the land described by the Leases "exclusively unto said Lessee [then, HDOC, and, by subsequent assignment, Plantation] for the sole and only purpose of investigating, exploring, prospecting, drilling and operating for, developing and producing oil and gas." The ORRI Owners were wholly dependent on the Stroud Defendants to keep the lease alive. And, while the supreme court found no evidence that Ridge Oil owed any contractual or fiduciary duties to Guinn, who was in a position to protect his own interests, there is undisputed record evidence in this case, in the form of the B&G Leases and Assignments themselves, that, as a matter of law, Plantation had a number of duties to the ORRI Owners that the record shows the Stroud Defendants intentionally and willfully caused it to breach.

In my view, *Sunac* and *Ridge Oil* do not support overturning the judgment in the ORRI Owners' favor on their claims of tortious interference with contract. Nor do the other cases of our sister courts of appeals cited by the majority support reversal of the judgment.

In *Sasser*, as in *Sunac*, the court considered claims brought by an ORRI holder who claimed that his interest had been washed out in "bad faith." 906 S.W.2d at 601–02. Sasser held an ORRI under an original lease in which Dantex,

33

the lessee, held a 75% working interest. *Id.* at 601. However, Sasser's ORRI did not apply to renewals or extensions of the original lease, and, as in *Sunac*, the lease's terms permitted Dantex to surrender the lease unilaterally at any time. *Id.*

The court refused to impose a fiduciary duty on Dantex under these circumstances, holding that the original lease had terminated when Dantex executed the new lease "with the intent and understanding that" the original lease was released, and the court stated that it was "not material" whether there was production in paying quantities at the time. *Id.* at 603. It noted that there were no facts to establish a confidential or fiduciary relationship. *Id.* at 606–07. The court emphasized that the "contractual right to unilaterally terminate the lease, coupled with the absence of any facts justifying the imposition of a confidential or fiduciary relationship," defeated Sasser's arguments for the imposition of some type of duty of good faith. *Id.* at 607.

Here, in contrast to *Sasser*, there was no surrender clause in any of the documents relevant to this case. Instead, the B&G Leases contained express provisions that imposed duties on the Lessee to perform its obligations in good faith for the benefit of all the owners of the B&G Leases, unless prevented by circumstances beyond its control, in which case it was required to make good faith efforts to restore production or be held liable for breach of the agreement. And if the B&G Leases terminated by cessation of production, they still continued in

34

force and effect for the benefit of the owners, including the ORRI Owners, on the forty acres surrounding the B&G Leases to a depth of 100 feet below any formerly producing well. Every successor Lessee honored its obligations to the ORRI Owners until Plantation purchased the Lessee's interest in the B&G Leases and promptly proceeded, in conjunction with the other Stroud Defendants' willful and intentional interference, to breach their own obligations to the ORRI Owners.

*Exploration Co. v. Vega Oil & Gas Co.* is likewise distinguishable. In *Exploration Co.*, the ORRI holder under the original mineral leases argued that new leases constituted renewals and extensions of the original leases, even though they were obtained more than a year after the old leases had expired under their own terms and involved different terms and parties. 843 S.W.2d 123, 124–25 (Tex. App.—Houston [14th Dist.] 1992, writ denied). The Fourteenth Court of Appeals held that the lessee had established as a matter of law that the leasehold estate under the old leases had expired as a result of non-production, and, thus, the overriding royalty interests in the old leases also had expired. *Id.* at 125. The court followed *Sunac*'s holding that "a new lease is not a 'renewal or extension' if the new lease was entered into after the old lease had already expired, new consideration exists to support the new lease, the new lease was executed under different circumstances, and the new lease contains different terms." *Id.* at 125–26. Because any assignment of rights to the ORRI holder occurred after the old

35

lease had expired and the new leases had already been acquired, it did not convey title to the holder of the ORRI. *Id.* The court also rejected the ORRI holder's argument that a renewal and extension clause automatically imposes on the lessee a fiduciary obligation to an overriding royalty owner. The court stated that the "mere assignment of an oil and gas lease reserving an overriding royalty interest does not in itself create a confidential or fiduciary relationship between the assignor and assignee" and that, "[i]f such a relationship is created, it must be by the terms of the assignment or by other acts of the parties." *Id.* at 126.

The court in *Exploration Co.* relied on the this Court's holding in *McCormick v. Krueger* that the holder of a new lease, who had bought the leasehold equipment from the working interest owners protected by renewals and extensions clauses in their assignments, was not obligated to honor the ORRIs of the working interest owners in the prior lease where it was undisputed that the original leases had expired at the time the new leaseholder had acquired the leasehold and equipment. *Id.* at 125 (citing *McCormick*, 593 S.W.2d at 729–30). Because *Exploration Co.* and *McCormick* concerned the lack of a renewal and extension clause in a lease that expired according to its terms, they are inapplicable to this case, in which Plantation repudiated the B&G Leases as to the ORRI owners and replaced them with new leases, in violation of the B&G Leases' terms.

36

Similarly, in *Wagner v. Sheets & Walton Drilling Co.*, the court of appeals refused to enforce with respect to a new lease an ORRI that had burdened the original lease on the same land because the original lease provided that it expired in the absence of production at the end of the primary term, there was no provision requiring that the lease be maintained beyond its primary term, and there were no provisions in the assignments providing that overriding royalties would be continued in new leases on the same property, even though the lessee had permitted the original lease to expire and had re-leased most of same land, "which [it] had the right to do under the [original] lease and the assignments." 359 S.W.2d 543, 544–46 (Tex. Civ. App.—Eastland 1962, writ ref'd n.r.e.); *see also Fain & McGaha v. Biesel*, 331 S.W.2d 346, 347–48 (Tex. Civ. App.—Fort Worth 1960, writ ref'd n.r.e.) (refusing to apply ORRI portion of lease that had been voluntarily surrendered to new lease where original lease permitted lessee to surrender lease at any time). *Wagner & Sheets* is distinguishable from this case in the same way that *Exploration Co.* and *McCormick* are distinguishable: the terms in the leases at in those cases were different from here and there was no breach of the lease terms.

Notably, however, the original lease at issue in *Wagner* provided—like the B&G Leases—that the original lease had *not* expired by cessation of production as to the forty acre tract around the gas well that had been drilled on the land subject to the original lease. The *Wagner* court held that, "[a]s to that 40 acres 'and no

37

more' the lease was by its terms perpetuated," and the rights of the ORRI holders were continued as to that forty acres. 359 S.W.2d at 546. The court thus recognized, like all of the other courts cited above, that the ORRI holder's rights were controlled by the provisions in the agreements assigning them overriding royalties and in the underlying leases. *See id.* Indeed, where presented with lease terms identical to terms at issue in this case, the court of appeals held that the lease terms *did* confer rights on the ORRI holder to continued royalty payments under the new lease as provided by the original lease, a lease identical in that respect to the B&G Leases. *See id.* The majority here, however, holds to the contrary.

The two federal cases from the Unites States Court of Appeals for the Fifth Circuit cited by the majority are no different. In *Keese v. Continental Pipe Line Co.*, the federal court refused to apply to a new lease the interests of ORRI holders in the original lease that had been surrendered by the lessee, stating that, unless "the instrument creating the overriding or royalty interest makes express provision to the contrary, the interest continues or ceases with the leasehold estate out of which it is carved and cannot survive termination by surrender or release of the leasehold estate by the owners." 235 F.2d 386, 388 (5th Cir. 1956). In addition, the court rejected the plaintiffs' arguments that the lessee had surrendered the lease in bad faith, observing that the "remote assignees in the leasehold chain of title[] were under no obligation to plaintiffs to drill or to continue to hold on to the lease"

38

and the fact that the assignees "knew or might have known that a good well could be brought in on the property, could not have prevented them from surrendering the lease to the landowners *for any reason or for no reason at all*." *Id.* at 388–89 (emphasis added). The court concluded its opinion by stating that "[t]he exercise by one man of a legal right cannot be a legal wrong to another" and that, "whatever one has a right to do, another cannot have a right to complain of." *Id.* at 389 (quoting *Montgomery v. Phillips Petroleum Co.*, 49 S.W.2d 967, 971 (Tex. Civ. App.—Amarillo 1932, writ ref'd)). Again, the surrender clause controlled and gave the lessee a legal right to discontinue the lease that was superior to the rights of the ORRI holders. No such defense is available to the Stroud Defendants here.

Similarly, in *In re GHR Energy Corp.*, the Fifth Circuit considered an overriding royalty agreement that included a renewals or extensions clause but that also provided that preservation of the lease was "solely at the will of [the lessee]." 972 F.2d at 99. Even though production never ceased, the lessee terminated the lease and entered into new leases, thereby extinguishing the overriding royalty owner's interest in the original lease. *Id.* at 98. As in the other similar cases cited above, the court held that the lessee "was free to terminate the leasehold estate" and "cut off" the overriding royalties pursuant to the lease's surrender clause, despite the fact that gas production never ceased. *Id.* at 100. Like the Texas Supreme Court in *Ridge Oil*, the court noted on rehearing, "We might well reach a

39

different result if the facts here had suggested that [the lessee] surrendered its interest in the lease *to destroy the rights of the overriding royalty interest owner.*" *In re GHR Energy Corp.*, 979 F.2d 40, 41 (5th Cir. 1992) (op. on reh'g) (emphasis added). Notably, the court made this observation in a case where there was a surrender clause—not in a case like this one, where there is none.

Neither the reasoning nor the conclusions reached by the courts in these cases is at odds with the conclusions I have drawn from the evidence in this case. Rather, they lend themselves to the argument that when, as here, an oil and gas lease under which an ORRI holder's rights arise imposes obligations on the lessee, the decision-maker for the lessee intentionally and willfully causes the lessee to violate the terms of the lease as to the ORRI holder, and there is no surrender clause that permits the lessee to relinquish the lease at will, the royalty interest owners have a cause of action for tortious interference with their contract, a cause of action the ORRI Owners in this case pled and proved.

I agree with the majority's conclusion in this case that "we must consider the language of controlling documents and the circumstances and relationships of the parties to determine whether the Stroud Defendants have committed an actionable wrong." However, the majority does not address the controlling documents in this case. Moreover, I disagree with the majority's characterization of the Stroud Defendants' actions as merely "allowing the B&G leases to expire with one of

40

their intended purposes being to extinguish appellees' interests." This characterization of the Stroud Defendants' actions is inconsistent with the facts of this case, as evinced by the provisions of the B&G Leases and the Assignments violated by the acts of the Stroud Defendants, acts recited by the majority itself and, in my view, correctly found by the jury to constitute tortious interference with and breach of the contract.

Moreover, I find the Stroud Defendants' argument that the Assignments granting the ORRIs did not contain any renewals or extensions clauses to be immaterial. The B&G Leases did not expire by their own terms, so that renewal or extension became an issue. Rather, the Stroud Defendants willfully breached and wrongfully terminated the B&G Leases. Nor is there any need for this Court to find a fiduciary relationship between the ORRI Owners and Plantation. The terms of the B&G Leases and the Assignments and the acts of tortious interference and breach by the Stroud Defendants suffice independently to establish the liability of the Stroud Defendants to the ORRI Owners.

I would overrule the Stroud Defendants' first and fourth issues.

**Conversion and Damages**

In their third issue, the Stroud Defendants argue that the trial court erred in entering judgment in favor of the ORRI Owners based upon their conversion claim because this claim was "for contract damages," is "barred by the economic loss

41

doctrine," and is based upon a "general debt satisfied by the payment of money." The Stroud Defendants further argue that the ORRI Owners' conversion claim is not supported by sufficient evidence because they received all the royalties they were due and had no interest in production from the leases subsequently entered by the Stroud Defendants on the same land.

In their second issue, the Stroud Defendants argue that there is no evidence to support the "only damages" awarded to the ORRI Owners because "99.9% of the damages are based on the impossibility of an expired lease generating royalties and the remaining $375 was paid in April 2010," shortly before trial. They note that the jury was instructed to consider only the "unpaid overriding royalties from the [B&G] Leases" in awarding damages, and they argue that, because it is "undisputed" that the B&G Leases "automatically terminated" according to their terms in April 2004, the ORRI Owners' damages are "zero as a matter of law." The Stroud Defendants also argue that the evidence is legally and factually insufficient to support the award of damages for the January 2004 overriding royalties because the ORRI Owners admitted to receiving those payments in 2010.

In response, the ORRI Owners assert that the "obvious measure of damages would be the [overriding royalty interest] payments that [they] would have received but for [the Stroud Defendants'] conduct" and that they "did not recover under the new leases, although the calculation of damages is based on the

42

production from those leases." In regard to the payments for overriding royalties from January 2004, the ORRI owners do not dispute that they received payment, but they contend that the payments were not timely and were not made in full because they did not include interest. The ORRI Owners argue that, because the Stroud Defendants intentionally destroyed their ORRIs, they are entitled to recover amounts consistent with the royalties they would have received had their interests not been destroyed, interfered with, or converted.

The elements of a conversion claim are that (1) the plaintiff owned or had possession of the property or entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property. *Khorshid, Inc. v. Christian*, 257 S.W.3d 748, 759 (Tex. App.—Dallas 2008, no pet.). A conversion claim is appropriate when an ownership interest in mineral rights, including an ORRI, has been wrongfully appropriated. *See In re Chinn Exploration Co.*, 349 S.W.3d 805, 810 (Tex. App.—Tyler 2011, orig. proceeding.) (applying conversion doctrine in suit to recover oil and gas royalties and stating, "As part of their conversion claim, Plaintiffs [mineral interest holders] must show that Chinn Exploration, unlawfully and without authorization, assumed dominion and control over the royalties attributable to

43

Plaintiff's claimed interests to the exclusion of, or inconsistent with, Plaintiffs' rights as owners").

The measure of damages for breach of the covenant to protect an oil and gas lease is the value of the royalties lost because of the lessee's failure to act as a reasonably prudent operator. *Coastal Oil & Gas Corp. v. Garza Energy Trust*, 268 S.W.3d 1, 18–19 (Tex. 2008). The measure of damages for conversion is the amount necessary to compensate the plaintiffs for their loss, which is, likewise, the amount of royalty payments they would have received had those payments not been converted. *See Groves v. Hanks*, 546 S.W.2d 638, 647 (Tex. App.—Corpus Christi 1976, writ ref'd n.r.e.) ("The damages in an action for conversion are measured by the sum of money necessary to compensate the plaintiff for all actual losses or injuries sustained as a natural and proximate result of the defendant's wrong."). The measure of damages for breach of contract and for tortious interference with contract is the same: the amount of money necessary to put the plaintiff in the same economic position he would have been in but for the interference with his legal rights. *Capital Title Co. v. Donaldson*, 739 S.W.2d 384, 391 (Tex. App.—Houston [1st Dist.] 1987, no writ).

The trial court asked the jury whether Plantation had converted the ORRI Owners' proceeds from their ORRIs in the B&G Leases, and the trial court instructed the jury that Plantation could be liable for conversion if it exercised

44

dominion or control over the personal property of another without consent of the owner and to the exclusion of the owner's right of possession and use. I would hold that this was a proper instruction and that there is sufficient evidence to support the jury's verdict awarding the ORRI Owners damages for the Stroud Defendants' exercise of dominion or control over that portion of the production from the B&G Leases to which they were entitled, and, likewise, from the production from the forty acres surrounding the breached and repudiated Leases to a depth 100 feet below the well producing on those Leases at the time Plantation breached the B&G Leases.

I would overrule the Stroud Defendants' third issue.

The jury awarded the ORRI Owners the percentage interest from production from the same wells on the same property that they were entitled to under the B&G Leases. This was a proper measure of damages under any of the theories pled and tried. The jury's damages awards are consistent with the evidence concerning the royalties that the ORRI Owners would have received had the production under the subsequent leases continued, instead, under the B&G leases.

The Stroud Defendants argue, however, that the ORRI Owners' claims are barred by the economic loss rule, which provides that "[w]hen the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone." *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986). This

argument is inapplicable, as the ORRI Owners' claims sound in tortious interference with contract and conversion, and the measure of damages is the same as the measure for contract damages—the economic loss to the subject of the contract, i.e., the royalties wrongfully withheld by the Stroud Defendants from the ORRI Owners, as the jury found. The economic loss rule has no relationship to this case. *See Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 418–19 (Tex. 2011) (recognizing tortious interference with contract as tort for which economic damages may be recoverable even absent physical injury or property damage).

I would overrule the Stroud Defendants' second issue.

### Attorney's Fees

In their ninth issue, the Stroud Defendants argue that the trial court erred in awarding the ORRI Owners their attorney's fees because their claim for "intentional termination" is not a claim based in contract and such a claim, if it existed, would be a tort claim for which attorney's fees are not recoverable. The Stroud Defendants further argue that the trial court erred in awarding the ORRI Owners their attorney's fees because it applied "the wrong segregation-of-fees" standard and that award is not "sufficiently definite." In their eleventh issue, the Stroud Defendants argue that the trial court's judgment is not "sufficiently definite because it suggests a quadruple recovery of attorney's fees."

The Texas Supreme Court has held that "if any attorney's fees relate solely to a claim for which such fees are unrecoverable, a claimant must segregate recoverable from unrecoverable fees." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006). However, in the same case, it stated:

> A recognized exception to this duty to segregate arises when the attorney's fees rendered are in connection with claims arising out of the same transaction and are so interrelated that their "prosecution or defense entails proof or denial of essentially the same facts." *Flint & Assoc. v. Intercontinental Pipe & Steel, Inc.*, 739 S.W.2d 622, 624–25 (Tex. App.—Dallas 1987, writ denied). Therefore, when the causes of action involved in the suit are dependent upon the same set of facts or circumstances and thus are "intertwined to the point of being inseparable," the party suing for attorney's fees may recover the entire amount covering all claims. *Gill Sav. Ass'n v. Chair King, Inc*., 783 S.W.2d 674, 680 (Tex. App.—Houston [14th Dist.] 1989), *modified*, 797 S.W.2d 31 (Tex. 1990) (remanded to the trial court for reexamination of attorney's fee award).

*Id.* at 311. Thus, "when discrete legal services advance both a recoverable and unrecoverable claim," the claims "are so intertwined that they need not be segregated." *Id.* at 313–14.

Here, the ORRI Owners' claims for "intentional termination" and tortious interference, although they sound exclusively in tort, are inextricably intertwined with their claims for breach of contract in that the damages in this case resulted from the Stroud Defendants interference with the B&G Leases, which caused Plantation, as the Lessee, to breach its contractual obligations to the ORRI Owners. Attorneys' fees are recoverable for breach of contract. TEX. CIV. PRAC. & REM.

47

CODE ANN. § 38.001 (Vernon 2008); *see HMC Hotel Props. II Ltd. P'ship v. Keystone-Tex. Prop. Holding Corp.*, No. 04-10-00620-CV, 2011 WL 5869608, at *17 (Tex. App.—San Antonio Nov. 23, 2011, pet. filed) (mem. op.) (holding that party was entitled to recover attorney's fees for its tort claim arising out of allegations that lease provided it with certain rights violated by opposing party). Because the ORRI Owners are entitled to an award of attorney's fees on their claims for breach of contract, which are inextricably interrelated with their other claims, I would affirm the attorneys' fees award.

I would overrule the Stroud Defendants' ninth and eleventh issues.

## Evidentiary Issues

I agree with the majority that the Stroud Defendants failed to preserve the argument in their twelfth issue that they are entitled to a new trial because the trial court committed a number of errors in making various evidentiary rulings. The Stroud Defendants have not shown that the jury award depended in any respect on inadmissible evidence that was objected to at trial, as necessary to preserve the issue. The issue is therefore waived. *See* TEX. R. APP. P. 38.1(i).

## Conclusion

For the foregoing reasons, I respectfully dissent from the majority's holding reversing and remanding this case. I would affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Keyes.

Justices Keyes, dissenting.